# NORFOLK AND WESTERN RAILWAY COMPANY *v.* CONLEY, ATTORNEY GENERAL OF THE STATE OF WEST VIRGINIA.

### ERROR TO THE CIRCUIT COURT OF KANAWHA COUNTY, STATE OF WEST VIRGINIA.

No. 197.   Argued October 13, 1914.—Decided March 8, 1915.

*Northern Pacific Ry.* v. *North Dakota, ante,* p. 585, followed to effect that while the State has a broad field for the exercise of its power in fixing intrastate rates for common carriers it may not require them to transport a segregated commodity or class of traffic either at less than cost or for a mere nominal consideration.

This court must on writ of error under § 237, Jud. Code, analyze the facts as found by the state court if it is necessary to do so in order to determine whether that which purports to be a finding of fact is so interwoven with the question of law involving the Federal right asserted as to be in substance a decision of the latter.

An analysis of the evidence in this case shows that the two cent a mile passenger rate established by ch. 41 of the acts of 1907 of West Virginia affords such a narrow, if any, margin over the cost of the traffic that the plaintiff in error is forced to carry passengers, if not at or below cost, with merely a nominal reward, and it follows that the State exceeded its power in enacting the same and that it is void as an attempt to deprive the carriers of their property without due process of law in violation of the Fourteenth Amendment.

THE facts, which involve the constitutionality under the due process provision of the Fourteenth Amendment of a statute of West Virginia fixing the maximum fare for

passengers on railways at two cents a mile, are stated in the opinion.

Mr. *John H. Holt* and Mr. *Lucien H. Cocke*, with whom Mr. *Joseph I. Doran* and Mr. *Theodore W. Reath* were on the brief, for plaintiff in error:

The earnings from intrastate passenger business must be separated from all other earnings to determine whether the act is confiscatory.

Chapter 41, Act of 1907, regulating passenger rates upon railroads in the State of West Virginia, and prescribing penalties for the violation thereof is unconstitutional. *Ches. & Ohio Ry.* v. *Conley*, 230 U. S. 513; *Coal Ry.* v. *Conley*, 67 W. Va. 129; *Consolidated Gas Case*, 212 U. S. 19; *Five Per Cent Case*, 31 I. C. C. 351, 407; *Int. Com. Comm.* v. *Un. Pac. R. R.*, 222 U. S. 541; *Knoxville* v. *Water Co.*, 212 U. S. 1; *Prentis* v. *Atlantic Coast Line*, 211 U. S. 210; *Railroad Co.* v. *Philadelphia*, 220 Pa. St. 100; *Smyth* v. *Ames*, 169 U. S. 466; *Southern Ry.* v. *St. Louis Hay Co.*, 214 U. S. 297.

The railroad properly shows the capital invested in its intrastate passenger service used and useful in that service.

The railroad company properly shows the earnings and expenses derived from and chargeable to its intrastate passenger business.

The railroad company should be allowed to segregate its intra-passenger earnings from all other earnings in the State in its attempt to show confiscation. *Atl. Coast Line* v. *North Carolina*, 206 U. S. 1; *Coal Ry.* v. *Conley*, 67 W. Va. 174; *Lake Cargo Coal Rate Case*, 22 I. C. C. 604; *Louis. & Nash. R. R.* v. *Alabama*, 208 Fed. Rep. 35; *Minnesota Rate Cases*, 230 U. S. 352; *Missouri Rate Cases*, 230 U. S. 474; *M. & St. L. R.* v. *Minnesota*, 186 U. S. 257; *Smyth* v. *Ames*, 169 U. S. 466; *S. & N. A. R. R.* v. *Alabama*, 210 Fed. Rep. 465.

*Mr. A. A. Lilly,* Attorney General of the State of West Virginia, for defendants in error:

The carrier does not properly show the capital invested in its intrastate passenger service used and useful therein. The valuation proved is improper for a rate basis. *People v. New York,* 199 U. S. 1; *San Francisco v. Dodge,* 197 U. S. 70; *Missouri Rate Case,* 230 U. S. 474; *Allen v. St. Louis &c. Ry.,* 230 U. S. 552; *Chi., M. & St. P. R. R.* v. *Tompkins,* 176 U. S. 167; nor does it properly show intrastate earnings and expenses.

The carrier cannot segregate its intrastate passenger earnings from all other intrastate earnings in order to show confiscation. *Norfolk & West. Ry. v. Pinacle Coal Co.,* 44 W. Va. 574; *Railway Co. v. Conley,* 67 W. Va. 174; *Railway Co. v. United States,* 99 U. S. 402.

If the State allows the carrier to earn suitable return for its whole intrastate business it may require some commodities to be carried at a loss. *St. Louis &c. Co.* v. *Gill,* 156 U. S. 649; *Minnesota Rate Case,* 230 U. S. 352; *Minn. &c. Ry. v. Minnesota,* 186 U. S. 257; *Willcox v. Consol. Gas Co.,* 212 U. S. 19; *Atl. Coast Line v. Nor. Car. Corp. Comm.,* 206 U. S. 1; *Pens. & Atl. Ry. v. Florida,* 3 L. R. A. 661; *Penna. R. R.* v. *Philadelphia,* 220 Pa. St. 122.

A rate of 6% per annum is reasonable, *Covington &c. Co. v. Sanford,* 164 U. S. 578, but even if smaller, if any, the carrier cannot complain.

MR. JUSTICE HUGHES delivered the opinion of the court.

In 1907, the legislature of West Virginia passed an act fixing the maximum fare for passengers on railroads, as described in the statute, at two cents a mile. Acts, 1907, Ch. 41, p. 226. After the rate had been tested by operating under it for two years, the plaintiff in error brought this suit to restrain its enforcement as being in violation of the

constitution of the State, and also upon the ground that it was repugnant to the Fourteenth Amendment by reason of (1) its provision for penalties, (2) its classification of railroads, and (3) its alleged confiscatory requirements, through the reduction of the revenue from the traffic to less than a reasonable compensation. The validity of the statute, as construed by the state court, with respect to penalties and classification was upheld in *Chesapeake & Ohio Ry.* v. *Conley,* 230 U. S. 513. In the case of *Coal & Coke Ry.* v. *Conley,* 67 W. Va. 129, while the statute was sustained against the other objections above mentioned, it was adjudged to be confiscatory in its operation with respect to the plaintiff in that case. In the present suit the Circuit Court of Kanawha County by its decree entered in March, 1913, held that the rate was not confiscatory in fact as to the plaintiff in error. No opinion appears in the record and there were no special findings. An application was made to the Supreme Court of Appeals of West Virginia for the allowance of an appeal to that court, and it was refused. This writ of error was then sued out.

1. The fundamental question presented is whether the validity of the passenger rate can be determined by its effect upon the passenger business of the company, separately considered. What has been said in the opinion in *Northern Pacific Railway* v. *North Dakota,* decided this day (*ante,* p. 585), makes an extended discussion of this question unnecessary. It was recognized that the State has a broad field for the exercise of its discretion in prescribing reasonable rates for common carriers within its jurisdiction; that it is not necessary that there should be uniform rates or the same percentage of profit on every sort of business; and that there is abundant room for reasonable classification and the adaptation of rates to various groups of services. It was further held that despite this range of permissible action, the State has no arbitrary power over rates; that the devotion of the property of

the carrier to public use is qualified by the condition of the carrier's undertaking that its services are to be performed for reasonable reward; and that the State may not select a commodity, or class of traffic, and instead of fixing what may be deemed to be reasonable compensation for its carriage, compel the carrier to transport it either at less than cost or for a compensation that is merely nominal.

These considerations are controlling here. The passenger traffic is one of the main departments of the company's business; it has its separate equipment, its separate organization and management, and of necessity its own rates. In making a reasonable adjustment of the carrier's charges, the State is under no obligation to secure the same rate of return from each of the two principal departments of business, passenger and freight; but the State may not select either of these departments for arbitrary control. Thus, it would not be contended that the State might require passengers to be carried for nothing, or that it could justify such action by placing upon the shippers of goods the burden of excessive charges in order to supply an adequate return for the carrier's entire service. And, on the same principle, it would also appear to be outside the field of reasonable adjustment that the State should demand the carriage of passengers at a rate so low that it would not defray the cost of their transportation, when the entire traffic under the rate was considered, or would provide only a nominal reward in addition to cost. That fact, satisfactorily proved, would be sufficient to rebut the presumption of reasonableness; and if in any case it could be said that there existed other criteria by reference to which the rate could still be supported as a reasonable one for the transportation in question, it would be necessary to cause this to appear. *Northern Pacific Railway v. North Dakota, supra,* and cases there cited.

2. So far as findings are concerned, we have in the present case simply a general, or ultimate, conclusion of

fact which is set forth in the decree of the state court; and it is necessary for us, in passing upon the Federal right which the plaintiff in error asserted, to analyze the facts in order to determine whether that which purports to be a finding of fact is so interwoven with the question of law as to be in substance a decision of the latter. *Kansas City Southern Ry.* v. *Albers Commission Co.,* 223 U. S. 573, 591; *Cedar Rapids Gas Co.* v. *Cedar Rapids,* 223 U. S. 655, 668, 669; *Oregon R. R. & N. Co.* v. *Fairchild,* 224 U. S. 510, 528; *Creswill* v. *Knights of Pythias,* 225 U. S. 246, 261; *Southern Pacific Co.* v. *Schuyler,* 227 U. S. 601, 611; *Wood* v. *Chesborough,* 228 U. S. 672, 678.

3. The passenger rate in question went into effect in May, 1907, and was observed by the company until about September, 1909, when under the terms of the interlocutory injunction in this suit the charge was increased to two and one-half cents a mile. There were, therefore, two fiscal years, June 30, 1907, to June 30, 1909, during which the company operated its road in West Virginia under the statutory rate. Evidence was introduced on behalf of the company showing the results according to its calculations. It was testified that the intrastate passenger receipts had been carefully ascertained. With respect to the operating expenses, it was said that for many years accounts had been kept for the purpose of separating the expenses incident to the freight and passenger traffic, respectively; that about 65 per cent. of these expenses could be directly assigned, and that the remaining 35 per cent., consisting of items common to both sorts of transportation, were divided between the passenger and freight traffic on the basis of engine miles,—this being deemed to be more equitable than the train-mile basis originally used, inasmuch as most of the freight was hauled by two engines. In practice, this method was assumed—in accordance with an early computation—to mean that 20 per cent. of such items should be assigned to the passenger

traffic; this, it was insisted, was a close approximation. Where a division of the road was partly in one State and partly in another the passenger expenses were apportioned according to track mileage. These expenses within the State having thus been ascertained, they were divided between the interstate and intrastate traffic upon the basis of the gross passenger earnings; that is, it was assumed that the cost of the interstate and intrastate passenger traffic was the same in relation to revenue. It was also testified that betterments were not included in expenses, and that the above-mentioned apportionment covered all the operating expenses, except taxes, the latter being apportioned to each class of business according to its share of the gross receipts.

It was stated that the intrastate passenger receipts which had been $362,997.74 in the fiscal year 1906–7 [1] had fallen, notwithstanding a considerable increase in the number of passengers and passenger mileage, to $289,943.22 in the fiscal year 1907–8. The passenger expenses for the latter year, estimated according to the method above set forth, together with taxes, amounted to $275,519.79, leaving a net surplus of $14,423.43. In the following fiscal year, 1908–9, the intrastate passenger receipts were $281,864.50. This showed a reduction of $81,133.24, as compared with the fiscal year 1906–7, although there was a gain over that year of 1,567,374 in the passenger mileage. The expenses attributed by the company to the intrastate passenger traffic, including taxes, for the year 1908–9, amounted to $283,416.62, thus leaving a deficit in the passenger operations of $1,552.12.

In the receipts, as thus stated, there was omitted the revenue derived from the mail, express, news privileges and other items of passenger train earnings. Including this miscellaneous income, it appeared from the company's

---

[1] Approximately eleven months of the fiscal year 1906–7 were under the former maximum fare of three cents a mile.

statement that the net return of the intrastate passenger business for the year 1907–8 was $18,354.62; in the year 1908–9, the inclusion of these items still left a deficit amounting to $616.11.

Criticizing the methods of apportionment adopted by the company, the State presented on its part elaborate calculations for the purpose of showing the effect of the rate. These calculations were based upon a painstaking analysis made by the State's expert accountant of the receipts and expenses disclosed by the company's records and accounts. For this critical study there were selected the months of November, 1909, and May, 1910, which the State's witness testified were typical with respect to the passenger business of the fiscal year ending June 30, 1910. The examination was made of the traffic on the Pocahontas and Kenova divisions of the road, which contained over 90 per cent. of the total track mileage of the company in West Virginia, and the passenger traffic on which—according to passenger mileage—was stated to be over 97 per cent. of the whole. The testimony was that the results of the analysis of the traffic on these divisions could be deemed to be fairly representative of the entire passenger business. The receipts of the intrastate traffic were adjusted to the two cent fare basis; that is, according to the statutory rate as applied to the actual travel over the road. The State suggests that neither in its own calculations nor in those of the company was any account taken of the receipts from interstate passengers in West Virginia, but these were properly excluded. *Smyth* v. *Ames,* 169 U. S. 466, 541. The company had kept on its books separate accounts of the expenses of the freight and passenger business on the divisions above-mentioned, but the State's expert did not accept the company's distribution. For example, on the Pocahontas division, the books showed passenger expenses in November, 1909, amounting to $48,895.22; the witness for the State by his computa-

tions made these expenses $37,100.72.  On the same division in May, 1910, the company's figures for passenger expenses were $51,885.72; the State's, $40,643.36.  There were also similar reductions of considerable amounts on the Kenova division.  It is not necessary to review in detail the methods thus used on the part of the State to apportion the various common items of expense,—that is, after all items capable of direct assignment had been charged to the business to which they related.  It is sufficient to say that instead of employing a general factor for the distribution of the outlays common to both kinds of traffic, freight and passenger, the State's witness divided each particular common item according to its character so as to make what was deemed to be a fair apportionment of that item.  In this way, a variety of methods were employed which the witness described at length.  After ascertaining the amount of the total expense considered to be attributable to the passenger traffic within the State, it was divided between the intrastate and interstate business; and for the most part—aside from the expenses of passenger stations—the division was made on the basis of passenger miles and without charging extra cost to the intrastate traffic.

By combining the results of the selected periods, it was shown that in the intrastate passenger business, according to the classification and apportionment adopted, the operating expenses and taxes consumed 97.4203 per cent. of the total income.

This, in brief, was the result of the elaborate analysis presented by the State.  There is no reason to suppose that either the periods chosen or the methods used were unfavorable to the rate.  Included in the passenger business were the items of mail, express, excess baggage, etc.; the State did not present calculations as to the net return upon these items separately considered.  When the State's expert who testified that he had undertaken to

separate the cost of the express business, was asked on cross-examination whether with these items omitted the actual cost of carrying intrastate passengers was not in excess of two cents a mile, he said that it would be difficult to answer without a separate analysis of the mail item, but added that 'in rough computation' that cost was very close to two cents.

It is apparent, from every point of view that this record permits, that the statutory rate at most affords a very narrow margin over the cost of the traffic. It is manifestly not a case where substantial compensation is permitted and where we are asked to enter the domain of the legislative discretion; nor is it one in which it is necessary to determine the value of the property employed in the intrastate business. It is clear that by the reduction in rates the company is forced to carry passengers, if not at or below cost, with merely a nominal reward considering the volume of the traffic affected. We find no basis whatever upon which the rate can be supported and it must be concluded in the light of the principles governing the regulation of rates that the State exceeded its power in imposing it.

The judgment is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE PITNEY dissents.