## LOS ANGELES & SALT LAKE R. CO. v. PUBLIC UTILITIES COMMISSION OF UTAH et al.

No. 5285.  Decided October 28, 1932.  (15 P. [2d] 358.)

*Geo. H. Smith, R. B. Porter, W. Hal Farr,* and *L. H. Anderson,* all of Salt Lake City, for plaintiff.

*Geo. P. Parker,* Attorney General, and *Byron D. Anderson,* Deputy Attorney General, for defendants.

WOLFE, District Judge.

The petitioner sued out a writ of certiorari to have reviewed a decision of the public utilities commission denying an application to change St. John Station on its main line in Tooele County, Utah, from an agency to a nonagency station, and to have reviewed an order which denied a petition for a rehearing. The decision on the application to discontinue St. John as an agency station and the order refusing to grant the petition for rehearing stand on somewhat different footings. We shall therefore consider separately the record made on the application to discontinue the agency station, and thereafter the record made on the hearing had upon the petition for a rehearing. The application for permission to discontinue the operating of the station at St. John as an agency station was based on the fact that the revenues derived from the business handled at said station were not sufficient to justify the maintaining and operating of said station as an agency station, and that the plaintiff could furnish arequate and reasonable facilities to serve the public in the business conducted at such station without the presence of a day agent. The record consists of testimony offered by the railroad on the one hand, and by objecting stock raisers and farmers on the other. A decision denying the application resulted.

Subsection 2 of section 4783, Comp. Laws Utah 1917, as far as material to this case, reads as follows:

"Every public utility shall furnish, provide, and maintain such service, instrumentalities, equipment, and facilities as shall promote the safety, health, comfort, and convenience of its patrons * * * and the public, and as shall be in all respects adequate, efficient, just and reasonable."

Section 4834, Comp. Laws Utah 1917, provides in part as follows:

"* * * The review shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the constitution of the United States or of the state of Utah. The findings and conclusions of the commissions on questions of fact shall be final and shall not be subject to review. Such questions of fact shall include ultimate facts and the findings and conclusions of the commission on reasonableness and discrimination. * * *"

The matter of determining exactly what questions are before us has not been altogether free from difficulty. Perhaps the best approach to a determination of that matter can be had by determining first what question the commission had before it, and the legal principals to be considered in the determination of that question. The question before the commission may be stated as follows: In view of the gross operating revenues properly accredited to St. John station, would the requirements of subsection 2 of section 4783, as above set out, be satisfied by maintaining and operating said station as a nonagency station? This is the bald and shortest way of stating the question. Elaborated, it could be restated as follows: In view of the cost of maintaining an agency station at St. John, and in view of the gross operating revenue properly chargeable to said station, could the public obtain, without an agent, the adequate, efficient, just, and reasonable services which the public utility is required to furnish under subsection 2 of section 4783?

One of the first questions which should be discussed and decided is the question of what, if any, relationship there is between service and revenue. There is no absolute standard of a reasonable, adequate, or efficient service. There is a point at which almost any one might say that services were inadequate, and there is a point above which almost any one could say that the railroad company was giving more in the way of facilities than it should be required to give. But in between these points it would be somewhat a matter of each man's judgment as

to what the quantum of service should be to satisfy the requirements of subsection 2 of section 4783. From a strictly logical standpoint, one might ask why the question of revenues should have any place in the discussion. That is to say, why the quantum of facilities or services which satisfies the requirements of section 4783 should be variable, depending on the question of revenues. It might be argued that if you determine what service or facility is reasonable, efficient, adequate, or just for the community, then such service and facility is not the more or less adequate or reasonable because of the question of revenues. As a practical matter, however, the quantum of facilities or services which is necessary to satisfy the requirements of subsection 2 of section 4783 does depend upon the revenues which the station produces or helps to produce. As a practical matter, it seems perfectly obvious that the railroad can afford to give and should give more, or a service of a higher or better type or character, and provide better or more facilities where the station yields ample and sufficient revenue to do so, than where the station is a low producer of revenue. See *St. Louis & S. F. R. Co.* v. *Newell,* 25 Okl. 502, 106 P. 818.

However, we cannot accept the principle that the revenue chargeable or accredited to a certain station should be the sole controlling factor in determining the services of facilities to be provided. It is quite true that in certain cases the railroad cannot be compelled to carry on the business of transportation at a loss. A railroad may go out of business altogether. See *Brooks-Scanlon Co.* v. *Railroad Commission of Louisiana,* 251 U. S. 396, 40 S. Ct. 183, 184, 64 L. Ed. 323. In this case it was held that:

"A carrier cannot be compelled to carry on even a branch of business at a loss, much less the whole business of carriage"—citing *Northern Pacific Ry. Co.* v. *North Dakota,* 236 U. S. 585, 35 S. Ct. 429, 434, 59 L. Ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1, and *Norfolk & Western Ry. Co.* v. *Conley, Atty. Gen.,* West Virginia, 236 U. S. 605, 35 S. Ct. 437, 59 L. Ed. 745.

"* * * It is true that if a railroad continues to exercise the power conferred upon it by a charter from a State, the State may require it to fulfill an obligation imposed by the charter even though fulfillment in that particular may cause a loss."

This is quite a different case than that contended for here by the plaintiff. We do not believe it has ever been held that every facility or every service of the railroad must be made to pay, or that it can be discontinued. In the case of *Vandalia Railroad Co.* v. *Schnull, etc.*, 255 U. S. 113, 41 S. Ct. 324, 65 L. Ed. 539, it was held that:

"A railroad rate fixed by the state authority violates the Fourteenth Amendment if it does not yield the carrier a reasonable return upon the class of traffic to which it applies."

The railroad company contended:

"That the revenue from traffic to which the rates apply is the test of their legality and any deficiency in them cannot be made up by rates on some other traffic. * * *"

The contention of the defendants in error was:

"That the revenue from all of the intrastate business of the Railroad Company is to be taken into account, and, if it be sufficient to remunerate the Railroad Company, the particular rates, though unremunerative, are nevertheless legal."

The court held with the railroad's contention.

It was held in the West Virginia case above cited that the state

"has no arbitrary power over rates; * * * and that the state may not select a commodity or class of traffic, and instead of fixing what may be deemed to be reasonable compensation for its carriage, compel the carrier to transport it either at less than cost, or for a compensation that is merely nominal."

In the North Dakota case above cited the court held that the Legislature

"has a wide range of discretion in the exercise of the power to prescribe reasonable charges, and it is not bound to fix uniform rates for

all commodities, or to secure the same percentage of profit on every sort of business. * * * It is not bound to prescribe separate rates for every individual service performed, but it may group services by fixing rates for classes of traffic."

And in the Schnull Case, the court said:

"This court will not sit in judgment upon such action and substitute its judgment for that of the legislature when reviewing 'a particular tariff or schedule which yields substantial compensation for the services it embraces, when the profitableness of the intrastate business as a whole is not involved.' 'But * * * a different question. arises when the State has segregated a commodity, or a class of traffic, and has attempted to compel the carrier to transport it at a loss or without substantial compensation even though the entire traffic to which the rate is applied is taken into account.' "

We think that the mere quoting of the language above stated will amply reveal the distinction between those cases and a case where it is claimed that every single service or facility must be made to pay or the railroad has the right in law to discontinue it. A railroad cannot be required to perform the actual services of transportation for which it is constituted at a loss, but that does not mean that every service or facility embraced or involved in the transportation must itself be made to pay or else be discontinued. It is somewhat a matter of degree, and whether the service is severable from its integrated business of transportation.

In the case of *Bullock* v. *State of Florida*, 254 U. S. 513, 41 S. Ct. 193, 194, 65 L. Ed. 380, we have the same question decided as we have had in the Brooks-Scanlon Company Case, wherein it was decided that:

"Apart from statute or express contract people who have put their money into a railroad are not bound to go on with it at a loss if there is no reasonable prospect of profitable operation in the future. *Brooks-Scanlon Co.* v. *Railroad Commission of Louisiana*, 251 U. S. 396, 40 S. Ct. 183, 64 L. Ed. 323. No implied contract that they will do so can be elicited from the mere fact that they have accepted a charter from the State and have been allowed to exercise the power of eminent domain."

From the principal that a railroad company may give up its charter and discontinue its entire business, and not be compelled to operate its road at a loss, cannot be deduced the principle that it can discontinue every part of its services that it cannot continue at a profit.

Plaintiff rightly draws a distinction between those services on the one hand which are of the essence of the absolute or primary duty of the carrier, that is, its duty to transport passengers and freight, and those services which are necessary to insure the safety of the public, and on the other hand those services which are incidental to its primary or absolute duty, or not required in its duty to insure safety. See *Oregon R. R. & N. Co.* v. *Fairchild*, 224 U. S. 510, 32 S. Ct. 535, 56 L. Ed. 863. This case holds that the expense incurred by the carrier should be considered in determining the type, nature, or extent of the facility or service to be furnished, even when such service or facility is part of, or necessary to, the performance of its absolute duty, and that where it is a service or facility not included in the absolute duty of the railroad the question of expense is of more controlling importance. See, also, *Seward* v. *Denver & Rio Grande R. R. Co.*, 17 N. M. 557, 131 P. 980, 46 L. R. A. (N. S.) 242.

In the case of *San Juan Coal & Coke Co.* v. *Santa Fe, S. J. & N. R. R. Co.*, 35 N. M. 336, 298 P. 663, it was recognized that the cost of maintaining an agency is one of the necessary ingredients in establishing the question as to whether the Railroad Commission had the power to require the carrier to establish an agency station. It will be noted that this case, as also the Seward Case cited above, is from the jurisdiction of New Mexico where the Supreme Court itself by the Constitution, upon the evidence, determines the reasonableness and lawfulness of the order made by the commission. The question, therefore, that the Supreme Court of New Mexico decided is entirely a different question than may be decided by this court under section 4834, Comp.

Laws Utah 1917, as we shall later more fully explain in a further consideration of the Seward Case hereunder.

Under the Constitution of New Mexico, the Supreme Court had the right to take the record and determine the lawfulness and reasonableness of the commission's order, just as if the Supreme Court had itself sat for the first time. It could weigh the evidence and draw its own conclusions to determine whether the commission's order was lawful or reasonable, whereas, under section 4834, the scope of the review accorded to this court is of a different nature.

In another New Mexico case, entitled *Randall et al.* v. *Atchison, T. & S. F. Ry. Co.*, 34 N. M. 391, 281 P. 479, it was held that:

"In testing the reasonableness of an order requiring a railroad agent at a point where not needed for public safety, both the public convenience to be served and the increased cost of the service are to be considered."

These factors, which the Supreme Court of New Mexico considered under its broad power of review given to it under the Constitution of New Mexico, are exactly the same factors which the commission should consider in determining the question as to whether the agency should be continued. This court in reviewing the decision of the commission, does not directly measure, consider, or determine these two factors and come to an independent decision which, if in conformity with the commission's decision, would work an affirmance of that decision, and, if contrary, work a reversal. The province of this court, under section 4834, is to determine first whether the commission has considered those two factors, and whether there is any substantial evidence upon which it could, as reasonable men, come to the conclusion it did come to.

In *St. Louis & S. F. R. Co.* v. *Newell*, 25 Okl. 502, 106 P. 818, 820, the court held as follows:

"But the facilities afforded at any station to the general public must in a measure be commensurate with the patronage and receipts

from that portion of the public to whom the service is rendered. Otherwise, not only would an injustice be done the railway company, which would be required to furnish the services at a financial loss, but the other portions of the general patronizing public would be required to pay an additional charge for the service rendered to them, over and above that necessary to pay the expenses of such services, and a fair and reasonable dividend on the investment of the railway company, in order to make up the deficit for the additional services required at such places."

We can therefore agree with the plaintiff that the matter of revenue chargeable to or produced by a certain station is one of the controlling factors in determining the nature, type, character, and extent of the service of facility to be provided, but we cannot agree that it is the sole controlling factor. There must be some rough ratio between expense and service; some rough balancing of these factors. Not only is the relationship between the cost of service and the revenue accredited or chargeable to the station an important factor, but the necessity or convenience of the service or facility is also an important factor. The cost revenue relationship is a controlling, but not the sole, guide to the type, nature, character, and extent of the service or facility to be furnished. In the last analysis, if the station is to continue at all, there may be a certain minimum of service, or facility which would have to be furnished regardless of the cost revenue factor in order to satisfy subsection 2 of section 4783. In other words, we cannot accept the proposition that the service or facility to be furnished is so dependent on the revenue factor that it could be indefinitely reduced in extent or changed in character accordingly as the revenue was reduced. A close reading of the case of *Chicago, R. I. & P. Ry. Co.* v. *State,* 24 Okl. 370, 103 P. 617, 24 L. R. A. (N. S.) 393, and cases therein considered, will reveal that they are not contraray to what has been said above in a case such as we have before us. Where the service or facility is a part of the total sum of services or facilities to be provided by the railroad in order to produce a total revenue, and not such a severable part of the rail-

road's operation, such as a branch line or rate upon a certain commodity, which, as we have seen, the railroad would not be required to maintain at a loss, there must be a minimum of service which is necessary to satisfy the requirements of subsection 2 of section 4783. Expressed in mathematical language, the service is not completely a variable dependent of the cost revenue factor. There may be cases where, even if it costs more to operate an agency station than the revenues accredited to it amount to, the requirement of rendering reasonable and adequate service to the public could still demand that it continue. If, in such a case, the commission should require the railroad to continue it as an agency station, could this court say as a matter of law that the commission should have granted the application? We think not.

It was held in the case of *Chicago, R. I. & P. Ry. Co.* v. *Nebraska State Railway Commission,* 85 Neb. 818, 124 N. W. 477, 478, 26 L. R. A. (N. S.) 444, that:

"The mere fact that the income from the expenditure at a particular point upon its line may not earn a fair return upon the capital invested at that point can only be considered in connection with the revenue from the entire operation of the road within the state at least. In such an appeal from an order to establish a station, the whole demand for both freight and passenger service must be considered; and if, taking all the circumstances into consideration, the order is not unreasonable, the appeal will be dismissed."

See, also, *Morgan's L. & T. R. & S. S. Co.* v. *Railroad Commission,* 109 La. 247, 33 So. 214. It was held in the case of *State ex rel. Railroad & W. Commission* v. *Northern P. R. Co.,* 90 Minn. 277, 96 N. W. 81, 82, that the sole question of expense in the operation of a railway station, or the diminution of the profits secured therefrom, will not justify the removal or change thereof, where the rights of the public have become affected to such an extent that substantial interference therewith would be a disadvantage to the patrons of the company.

The court in this case put its decision upon the principle that:

"The discontinuance of an established railway station which their patrons have been permitted to use for years, upon the faith of whose location the people of a village and the surrounding country have depended, cannot be determined solely by the consideration whether a railway station is profitable to the road, nor upon its convenience and the adaptation of its affairs to the increased advantages and methods of transacting its business, nor by the test whether the continuance of a station will require it to incur increased expense."

In the case of *Delaware, L. & W. R. Co.* v. *Railroad Commissioners,* 79 N. J. Law, 154, 74 A. 269, the court held, in discussing the right of a railway company to abandon a station:

"* * * That the withdrawal of railroad facilities which had been given the public, and upon which they were justified in relying, 'might be held to be reasonable if it had been shown that from changes naturally resulting an altered condition existed, such as the falling off of population; or the drifting of trade into new channels, and a depreciation of business resulting therefrom, in consequence of which a continuance of such facilities became unnecessary; or that the public was requiring services at a prohibitive cost.'" See note 26 L. R. A. (N. S.) 445.

In the case of *Darlaston Local Board* v. *London & N. W. R. Co.,* 2 Q. B. 694, it was held that a railroad company was not bound to maintain a station which was operated at a loss, and might lawfully close it. In the case of *Louisiana & A. Ry. Co.* v. *State,* 91 Ark. 358, 121 S. W. 284,

"a special act of the legislature * * * which required the construction and maintenance of a station at a point in a sparsely settled community with meager business interests, which would result in a large expense to the railway company without any corresponding benefit to it or the public," was held void.

"But upon an earlier appeal of the last case (see 85 Ark. 12, 106 S. W. 960), it was held that the fact that the cost of erecting and maintaining a railway station at such point would be greatly in excess of, and out of proportion to, the revenues possibly to be derived from the business therefrom, does not render unenforceable such special act of the legislature, but that such fact would be important

for the court to consider in determining whether such requirement was arbitrary and unreasonable, and whether there was any corresponding necessity for such station." See note 26 L. R. A. (N. S.) 445.

In the cases of *Mobile & O. R. Co.* v. *People*, 132 Ill. 559, 24 N. E. 643, 22 Am. St. Rep. 556, and *Chicago & A. R. Co.* v. *People*, 152 Ill. 230, 38 N. E. 562, 26 L. R. A. 224, it was held that a railway company cannot be compelled to establish a station and construct a depot at a point where the cost of maintenance will exceed the profits resulting therefrom. See, also, note to *M., St. P., & S. Ste. M. R. Co.* v. *Railroad Commission*, 136 Wis. 146, 116 N. W. 905, 17 L. R. A. (N. S.) 821.

The above cases mostly relate to the matter of compelling a railroad company to establish a railroad station, or refusing to permit it to discontinue a railroad station, and not to the matter of discontinuing an agent merely; yet they throw some light upon the question of whether the fact that a railroad may lose money on a station is itself sufficient in law to justify the refusal to establish a station or the discontinuance of an already existing station.

While the relation of cost to revenue would be a very important factor in the court's determining whether or not the commission had erred in refusing to grant the application, because it would be an important guide to the determination of the type, character, and extent of the service which could be called reasonable and adequate, yet there is a certain minimum of service which would be necessary to satisfy the statutory requirements, and, if there was any substantial evidence to justify a finding that an agent was needed to give that sort of service, the court would have to affirm the decision of the commission. Each situation must stand on its own legs. It is impossible to lay down a rule which would fit each case. Certainly, if it appeared that the revenue was greatly incommensurate with the service or facility which the community demanded, and further appeared that what might be called the quantum of necessity

was such as to make the continuance of the service unquestionably an incommensurate burden upon the railroad, then it might be that if the commission denied the application to discontinue the service it would be considered unjust, arbitrary, and unreasonable, and a denial to the applicant of due process of law because it resulted in the confiscation of property.

We have purposely discussed the case where the cost of maintaining the service was even greater than the revenue which could be accredited as having accrued from the service. We have no figures in evidence which would show whether, if we subtracted from each dollar of gross operating revenue all of the operating expenses and taxes allocated to each dollar of revenue, the difference would be less than the cost of maintaining the agency station at St. John allocated to each dollar of gross revenue accredited to St. John Station. The plaintiff, in its reply brief, stated that in the year 1930 the plaintiff paid 83.38 cents out of every dollar of its earnings for operating expenses and taxes, and for the first eight months of 1931 this figure was 88.71 cents. These figures, of course, include station costs as a part of the content of operating expenses, being averaged at 3.65 cents and 3.99 cents per dollar of operating revenue for the years 1930 and 1931, respectively. While this is contained in the brief it was not introduced in evidence. As stated above, even had it appeared in evidence it would still be a question for the commission to decide whether, in view of such facts, the plaintiff should not continue the agent at St. John in order to satisfy the requirements that the community of St. John and its hinderlands be provided with just, reasonable, and adequate service. If this court could not say, upon the review of such evidence, that the commission had acted unreasonably because there was substantial evidence, to justify its finding that such service, even in view of the cost revenue factor, was necessary, this court would have to affirm the decision of the commission denying the application of the plaintiff, although with such

evidence it could be said that the quantum and nature of the service or facilities which would be considered adequate and reasonable to meet the public necessity and convenience at St. John would need only be such as would be required actually to handle the business at St. John with the minimum of cost, without subjecting the shippers to great inconvenience or actual probability of monetary loss.

Having stated that the question which the commission was called upon to decide was whether, in view of the cost revenue factor at St. John, adequate and reasonable service, as required by subsection 2 of section 4783, could be furnished by maintaining a nonagency station there, and the commission having decided that it could not, what is the question which is before this court on review? Referring again to section 4834, Comp. Laws Utah 1917, quoted heretofore, this court can only determine whether the commission has regularly pursued its authority or whether its order or decision violates any right of the petitioner under the Constitution of the United States or of this state, and, further, which is not part of section 4834, but which this court by virtue of its inherent power has the right to determine, whether the findings of fact and conclusions of the commission are supported by any substantial evidence, and whether, if the findings and conclusions are not so supported, there is substantial evidence to support its decision.

Since the petitioner has relied upon several cases from the jurisdiction of New Mexico, the scope of the review of this court under section 4834 may be made more clear, we believe, by considering those cases, and especially the cases of *Seward* v. *D. & R. G. R. Co.*, mentioned heretofore. This case discusses the right of review of the Supreme Court of New Mexico under sections 7 and 8 of article 11 of the Constitution of that state. We may then note the difference in the power of the courts of that jurisdiction to review a decision of its commission as compared with the power of this court to review a decision of our commission. It was held there:

"That said sections provide for a review by the Supreme Court of the reasonableness and lawfulness of an order made by the State Corporation Commission, upon the evidence adduced before the Commission; * * * the court not being bound *by the findings of the Commission, and the party affected having the right, on the original hearing, to introduce evidence as to all material points. * * *"

And that:

"The Supreme Court, under the constitutional provisions, upon the evidence, determines the reasonableness and lawfulness of the order made by the Commission; if it finds such order to be reasonable and lawful it enforces it; if, on the other hand, it finds such order to be unreasonable or unlawful, it refuses to enforce the same." (Italics ours; quotations from syllabus.)

The Constitution of New Mexico provides that either party may remove the cause from the commission to the Supreme Court within a time limited. If the Seward Case and the case of *Randall* v. *Atchison, T. & S. F. Ry. Co.,* 34 N. M., 391, 281 P. 479, and the San Juan Coal & Coke Company Case above cited, another New Mexico case, are all carefully examined, it can be readily seen that the Supreme Court of New Mexico has quite different powers on a record coming from the commission than has this court. The question as to whether section 4834 provides due process of law has not been raised by either party, and we are assuming for the purposes of this case that the right of review as circumscribed by the provisions of that section is due process. If the power of this court to review the proceedings and the evidence before the commission were the same as given to the Supreme Court of New Mexico, we could review the evidence and determine whether *in our opinion* the commission's judgment was correct, and we could determine from the evidence itself, as if the question had been before this court for the first time, whether the application of the railroad should not be granted. Under the New Mexico procedure, the commission on appeal is considered analogous to a referee taking testimony and submitting recommendations. The court may or may not follow the recom-

mendations; its judgment operates directly on the evidence and not on the decision of the commission. But we cannot do that under the provisions of section 4834.

Technically stated, our power of review goes to the extent of determining whether there was any substantial evidence to support the decision of the commission. But the decision of the commission was as to a question of indefinite nature and content. The difficulty in applying the rule as to whether there is substantial evidence to support the decision arises, not from the rule, but from the nature of the question which the commission had to decide. It had to decide what was or what was not reasonable and adequate service for the community of St. John, considered in the light of the cost revenue factor. Now, whether or not there is substantial evidence in the record to support its decision that discontinuance of the agency would not provide such reasonable and adequate service, depends, on analysis, upon the question of what one's judgment is as to what is reasonable and adequate. To one mind the visualization of the use the patrons of the railroad could make of the facilities provided by the railroad after discontinuance of the agent would not be reasonable and adequate; consequently to such minds there would be ample evidence to sustain the decision of the commission. In the judgment of another mind, the use and method of use of such proposed facilities to which partrons would be required to conform would be reasonable and adequate service in the light of the cost revenue factor, and as to such minds the decision would not be supported by substantial evidence. We thus see that the difficulty in applying the rule comes from the nature of the question to be decided, and the indefinite content which lies in the words "reasonable," "efficient," "adequate," and "just." These are indefinite measuring words which vary somewhat with the mind which must give them content.

In the ordinary case where a jury, tribunal, commission, or official is the factfinder, we have a case where certain underlying facts must be determined, and after they are

once determined a definite conclusion flows. This court then need only determine whether there is evidence which, reasonably interpreted, supports the underlying facts as found by the factfinder and whether the deduction made therefrom is the one which must in law or logic flow therefrom. For instance, taking an example from the Industrial Commission, whether a man was injured by an accident in the course of his employment depends upon finding the fact of accident plus resulting injury plus the fact of employment, which latter fact may depend upon a legal relationship and what the man was actually doing at the time he purports to have been injured. We examine the record to determine whether there is any substantial evidence which can be interpreted to spell accident and injury, or, in other words, which support the subsidiary facts found by the Industrial Commission, and, if so, regardless of whether we agree, then determine whether the decision or ultimate fact is properly deducible or flows from those subsidiary facts as found. It is, in such case, a comparatively simple process to determine whether there is substantial evidence to support the decision of the commission. In the instant case, however, the ultimate fact to be determined by the commission depends not on a single deduction which must, of necessity, flow from certain underlying facts found, but on a matter of judgment as to a question with an indefinite content. The ultimate fact rests not alone on the mental process of correct weighing and interpreting of evidence and of correct deduction therefrom, but on the weighing and interpreting of evidence plus the judgment of the individual weighing and interpreting such evidence. And the judgment varies with the training, the experience, the general mental makeup, and other rather intangible "determiners" of the judges. What we are really asked to review, therefore, is the question of the judgment of the commission as applied to the evidence. But we cannot, like can the Supreme Court of New Mexico, substitute our judgment for the judgment of the commission. We must determine whether

any reasonable mind could have come to the same judgment as the commission on the evidence controlled by the principles of law heretofore discussed. If there is any evidence upon which any reasonably judging mind could come to the same conclusion that the commission came to, then we must affirm the decision. It is analogous to the test applied by the courts where they are asked to set aside a verdict. A court must not set aside a verdict merely because it disagrees with the verdict, but only if it is such that the court could say that no person in a reasonable state of mind, free from passion, bias, or prejudice, following the principles of law given it, could have so found under the evidence. This court must not determine whether its supposedly reasonable minds differ from the minds of the commission in the exercise of their judging faculties, but whether any reasonable mind could have agreed with the decision, in view of the law and the evidence.

How stands the matter in view of such a test? We have two factors to consider in determining whether the commission's minds operated reasonably upon the evidence, or, put in another way, whether the commission's judgment can be justified under any reasonable view of the evidence; the cost revenue factor, and the reasonable service factor.

The plaintiff introduced evidence showing that the Union Pacific System revenue accredited to St. John Station in 1930 was $15,813.84; that during the first eight months of 1931 it was $7,187.99. System revenue accredited to St. John consisted of all revenues derived from transportation of passengers and freight terminating or originating at St. John Station which accrued to the whole Union Pacific System, and which included revenue from less than carload lots forwarded and received, revenue from carload lots forwarded and received, passenger revenue in 1930 of $309.06, and in eight months of 1931 of $147.43, and miscellaneous during 1930 of $244.80, and during the eight months of 1931 of $192.16, and during the whole twenty months a total of $17.58 from Western Union

telegrams. It should be stated that since much of the revenue comes from range to range carload shipments of sheep and cattle, a large part of which occurs in October and November, and since no revenues for the year 1931 were included past August of 1931, some of the discrepancy between the proportions for the two years may be accounted for upon that fact. For instance, for the first eight months of 1930, 167 carloads of all freight moved in and out of St. John. In 1931, for the first eight months, 105 carloads moved in and out. In the last four months of 1930, 169 carloads were forwarded from or received at St. John, or two more carloads than the total number of which were moved in the first eight months of the same year. In 1929, a total of 278 carload lots were moved, of which 137 moved in the first eight months and 141 in the last four months. It is therefore not to be assumed from the evidence that the revenue for the entire year of 1931 would have dropped off so greatly as the figures $15,813.84 and $7,187.99 seem to indicate. If the same proportion of revenues could be allocated to the last four months of 1931, as were credited to the last four months of 1930, we could expect a total revenue from carload lots in 1931 of $14,780.99 as against $15,813.84 for 1930. The total expense of operating the station at St. John in 1930 was $2,337.31, and for the first eight months of 1931 was $1,317.93. The gross operating revenue of the plaintiff in 1930 was $23,000,000; the entire station expense was $832,000 for the same year. The ratio of station expense to gross operating revenue was therefore 3.61, or, put in another way, the station expense was 3.61 per cent of the gross operating revenue, or, still another way, 3.61 cents of every dollar taken in by the road went for station expenses. Using this ratio, St. John Station would have had to take in in 1930 approximately $64,000 in order that it might conform to the ratio of total station expenses to total gross operating revenue. And in 1931, in order to conform to this figure, St. John would have had to take in during the whole year $54,161. Fifteen cents of every

dollar of gross operating revenue accredited to St. John Station went in 1930 for station expense, and in 1931, based on an estimated revenue of $14,780.99 and upon a total station cost of $1,976.88 (being three halves of $1,317.93), 13.6 cents of each dollar of revenue. It is argued, therefore, by the plaintiff that this excess of the portion of each dollar of revenue accredited to St. John used for station cost there over and above the average figure of 3.61 shows that the revenues at St. John are far incommensurate with the services, and that the revenues do not justify the agency service. The deduction is not altogether sound because the percentage of total line station cost to total gross opperating revenue is not a sound test of whether a service is justified or not. If it were followed to its logical conclusion, it would end in an absurdity. The ratio of total station cost to total gross operating revenue involves an average. The total cost of all stations are lumped together and the proportion which this bears to the total gross operating revenue is found, thus showing what portion of each dollar of total gross operating revenue goes to total station expenses. But if each station's expense, which was above the average, were cut down so that the expense at that station would bear the same relation to the gross operating revenue chargeable to that station as the total station expense bears to the total gross operating revenue, then the new total of station cost proportioned to the gross operating revenue, granted that the latter remain the same, would give a new average, and by that same test the station costs would again have to be revised and cut down to conform to that new norm, which process could be repeated indefinitely until all the station costs would tend to zero. All costs would be eliminated finally by the elimination of all services in order to keep conforming to a decreasing norm affected by each succeeding deduction to conform to the last-ascertained norm. The truth is that this ratio is enlightening only as it shows us what portion of each dollar of the total gross operating revenue of the whole road goes to total station costs, but

is no test as to what portion of any particular station's gross revenue should be consumed in giving adequate and reasonable services. There are probably many stations on the road where the very minimum of service required would cost more than was reflected by this ratio. It cannot furnish any norm to which station costs must tend to conform. A station that yielded great revenue with comparatively little cost helps to bring down this average. It would be quite unsound to make the test of the service at any station such as would cost that amount as would make it conform to the ratio of total line station expense to total gross operating revenue. The question is not how much greater are the station costs at St. John that some other station costs per dollar of revenue, or how far from conforming to a norm the costs of St. John are, but can the station costs at St. John be reduced and still give the services required by subsection 2 of section 4783. In fact, there is no reason why a railroad should spend for services at any station, regardless of how much revenue was accredited to that station, any more than was needed to furnish the required reasonable and adequate services to the public. As suggested by the plaintiff, any more expenditure than was necessary to furnish the required services might, in the end, lay a burden on the shipper and the public, and especially in these times which call for every economy.

As to the cost revenue factor, therefore, it is not apparent from the evidence, as stated above, that the railroad was actually losing money in maintaining a day agency station at St. John, and, as stated above, even if it were we would not be prepared to say that that fact alone should have, as a matter of law, controlled the minds of the commission to the extent of making it inexorable upon them to grant the application. Even then the case would have to be decided upon all the facts and circumstances. If it should transpire that by subtracting from each dollar of accredited revenue at St. John Station that portion used for station expenses the remainder of each dollar would be insufficient

to bear its proportion of the railroad's operating expenses and taxes without being wholly or more than wholly consumed, the commission might still be justified in refusing the application, if such circumstances appeared as would require the continuance of the services in order to reasonably satisfy the requirements of subsection 2 of section 4783, and provided, of course, that there was substantial evidence to support that judgment. We have heretofore discussed that question.

Now as to the factor of the service to be rendered reasonably to satisfy the requirements of subsection 2 of section 4783. Can we say from the evidence that no reasonable mind could have concluded otherwise than that, in view of the cost of maintaining St. John as an agency station, and in view of the revenues accredited to it, the service and facility furnished by a nonagency station would, as a matter of law, satisfy the requirements of subsection 2 of section 4783. If reasonable minds could differ, the judgment of the commission should prevail. We have heretofore discussed the soundness of the argument which is based on the ratio of total station cost to total gross operating revenue, and have already concluded that we could not say that reasonable minds could not differ on the question as to whether the costs of service were incommensurate with the revenue accredited to St. John. It remains to consider the evidence to determine whether, in view of that cost revenue relationship, the evidence is such that a reasonable mind could not have adjudged that the adequate and reasonable service required by subsection 2 of section 4783 would not demand the continuance of an agency station at St. John.

The evidence showed that the protestants were mainly farmers and live stock growers operating at St. John or in territory tributary thereto, and that the great bulk of the freight shipped from and received at St. John Station were carload lots of sheep and cattle. There was no substantial evidence which would justify the commission in refusing the application of plaintiff to discontinue the agency be-

cause of the passenger business or on account of less than carload shipments moving in or out of St. John, so we do not need to consider the evidence or the effect nonagency would have on such services. We can say that the manner in which such business would be handled without an agent, would, as a matter of law, satisfy the requirements of the statute. It appears to us no reasonable minds could differ that such service would be reasonable service as required by the statute. The objections to the discontinuance of the agent in reference to this carload business fell under two or three headings: First, difficulty and inconvenience in obtaining information (a) as to when "empties" could be ordered and "spotted," (b) when they would be picked up after being loaded, and (c) when consignments of live stock would arrive or could be expected for the purpose of unloading; (2) the manner of prepaying freight when carload or less than carload lots were shipped from a nonagency station to St. John or from St. John to a nonagency station; and (3) miscellaneous matters, such as telegraph services not pertaining to transportation, and such accommodations as friendly humans give other humans when dealing face to face.

The railroad maintained that the shipper could order cars by letter or postcard or through the agent at Stockton or some other agent along the line by using the telephone at St. John village, which is about five miles from St. John Station, or by ordering through any train conductor or through the section foreman or through the wife of the section foreman (the section foreman lived close to the station), and the section foreman or his wife could obtain the information by using the train dispatcher's telephone circuit. It is claimed that information could be obtained through the same mediums as to the time cars would be spotted and as to the time consignments to St. John would arrive, and as to the probable times that loaded cars of sheep or cattle would be picked up at St. John. The station agent at Stockton could only be reached from St. John

village by a party line through the Tooele exchange. There was considerable evidence that in the case of shipments of live stock the matter of feedings and watering them required very close attention, and that shippers would have to know fairly accurately when a loaded car would be carried out of St. John and when a car consigned there would arrive for the purpose of unloading; otherwise the live stock might lose weight or require extra feed and water to be brought while they were waiting for the car to be picked up. There is also evidence that unless the shippers could be assured of expeditious service in the "spotting" of cars for the loading of live stock, buyers might change their minds or the shippers might lose money on account of the change in the market. There was some evidence, also, that the telephone service between St. John and Stockton through Tooele was not very efficient and had required shippers to wait for hours in order to receive a reply, and sometimes failed altogether. There was also evidence that the section foreman was out on duty most of the day and that he could be reached in the morning and evening, and that word could be left with his wife; that a station agent can keep in communication through the dispatcher's circuit with the various agents on the road and get very much more timely information as to when consignments will arrive or when loaded cars might be picked up. The evidence also shows that most of the shipping of live stock, most of the shipping of any kind, during the years of 1929, 1930, and 1931, occurred in the months of April, May, October, and November, with fairly heavy shipping in September, and in the year of 1929, in March, and in the year of 1930, in February. In 1929 there was also fairly heavy shipping in September, but during the years of 1929, 1930, and 1931, the carload lots that moved in and out of St. John during June, July, and August, and in January, were comparatively small.

The evidence seems to establish with fair conclusiveness that shippers could order cars and obtain information as to when they would be supplied without an agent, but that the

services of an agent were quite helpful and convenient and perhaps resulted in financial gain, or at least aided in preventing losses when it came to obtaining information as to when cars loaded with live stock would be picked up or when they would arrive, and that there was some doubt as to whether the telephone service at St. John village or information obtained from train conductors or by means of the section foreman would be adequate or reasonable service. At least, laying aside all that the shipper could expect by way of courtesy or friendly accommodation of an agent that they personally knew or through telegraph service for their own business purposes that an agent might be able to give them, which we hardly believe that the railroad would be required to furnish, there appears to be substantial evidence upon which the commission could come to the conclusion that at least during the months of heavy shipments an agent is required to give the type of service required by the statute.

To recapitulate: The cost revenue factor in the determination of what is a reasonable and adequate service is one of the main and important factors, but not the sole factor; such determination depends upon all of the circumstances and facts bearing upon the situation and not upon the cost revenue factor alone; even though the cost of rendering a service would be more than the actual revenue received, it could not be said in law that that fact alone would be sufficient to permit the railroad to discontinue this service or facility; that in this case it does not appear that if we take from each dollar of gross operating revenue the fact of the operating expenses (excluding station expenses), fixed charges and taxes which each dollar must bear, the remainder would be less than that portion of each dollar of gross operating revenue credited to St. John Station used for station expenses at St. John; that there is sufficient evidence in this case to sustain the judgment of the commission that a nonagency station would not give reasonable and adequate service at least during the heavy months of shipping; that the original application of the

plaintiff did not include suspension of the agency during a part of the year, nor was the matter of discontinuing the agency for certain months of the year adequately called to the attention of the commission during the original hearing or a point made of it; that therefore the application of the plaintiff to discontinue the agency throughout the entire year was properly denied.

The plaintiff asked for a rehearing, filing an elaborate amended petititon for the same. A hearing upon the application for a rehearing was held on the 15th day of January, 1932, at which time the plaintiff offered to install a telephone at St. John Station so as to meet the objection that it was necessary for the patrons to search for the section foreman, which telephone would be connected with the station at Stockton and would give twenty-four hours service. The idea was that this would obviate the entire objection that the shippers had that they could not get information. The plaintiff also argued that the evidence on the original hearing showed that the great bulk of the shipping of carload lots in and out of St. John occurred over a period of four months, and the commission should have granted its application to discontinue the agency at least for a portion of the year during those months when the shipments in and out of St. John were scattered and few. This petition for rehearing was not like the ordinary petition in that regard, in that it was not just an attempt to show wherein the commission had erred in weighing or construing the evidence, or where it had misapplied or mistaken legal principles, but a new element was introduced; that is, the proffer to install a telephone. It may be that the commission took the view that the petitioner could not make an application for permission to do a certain thing and then, upon being refused, come in with some new or additional proposition, because that would mean that each time the petitioner found its application denied it could try some new offer; or the commission may have decided that it had already sufficient evidence before it from which it

could reasonably judge that public telephone service installed at St. John Station would not be reasonable or adequate service under the requirements of subsection 2 of section 4783. The denial of the petition for rehearing does not disclose on what ground the commission refused to grant the rehearing. The evidence does show that the offer to install the telephone at St. John was not for the purpose of pulling out of the fire a lost cause, or something which could reasonably have been offered when the original application was filed, but that it was the outgrowth of a situation which was revealed by the evidence at the original hearing. It is, then, in the nature of, and analogous to, a case in which newly discovered material and relevant evidence is found which might be likely to change the result of the trial, where it was shown that the party moving for the new trial had not lacked diligence in uncovering such evidence. So that if the commission refused to consider the matter of the telephone on the application for the rehearing because of procedural reasons, we believe the commission erred. In that regard it should have been considered as an original application. It would seem unnecessary to file a new original petition with this element in it. If, on the other hand, the commission refused to grant the hearing because it believed that the installation of the telephone would not provide the reasonable and adequate service required by the statute, we can say that we find no evidence in the record on the application for the rehearing or in the record of the testimony taken at the hearing on the original application sufficient for the commission to come to such a conclusion. There is nothing in the evidence adduced at the hearing on the application for the rehearing or the other testimony which the commission could conclude that the installation of this telephone, together with all the other means available to the shippers, would not be reasonable and adequate service required by the statute. We cannot say that it would or would not. That is not our province. It may be that the installation of a telephone would still leave the

situation such that the shipper could not obtain the reasonable and adequate service required by the statute. It may be that he would still have the inconvenience of locating the agent at Stockton, or that there are certain services which he would be entitled to that he could not get over the bell telephone, or that an agent could obtain through the dispatcher's circuit so much more expeditiously as to make its omission more than just a minor inconvenience. On the other hand, it may be that the installation of the telephone might solve the problems to an extent where all reasonable minds could say that all that the shippers would suffer would be some slight inconveniences which they might not have to submit to if they had an agent personally present. Those are matters which only a hearing on that question would disclose. We do not believe that the commission sufficiently explored the possibilities which the installation of a telephone would accomplish. In that respect we believe that the commission erred in denying the application for a rehearing. We also believe that the commission erred in denying the application for a rehearing when it was pointed out to them that there were some months during the year in which there was very little shipping of carload lots in and out of St. John, an element which we believe they were sufficiently excused from considering on the original application because it was not properly called to their attention, or a point really made of it. But, in view of finding No. 9 of their decision, we believe they should have given consideration to that matter, which the record does not show was given. It may be that if evidence is adduced upon a rehearing that it will be revealed that over a series of years the periods of heavier shipments are so uncertain as to require an agent to be there all the year around.

The case of *Oregon S. L. R. Co.* v. *Public Utilities Com. of Idaho,* 47 Idaho 482, 276 P. 970, is peculiarly like the present case with at least two exceptions. Heyburn, the station at which it was desired to discontinue the agency, was 6.1 miles from Rupert, and only 2.2 miles from Burley,

Idaho.   And it did not appear in that case that live stock was shipped in bulk from that station.   Moreover, the section was fairly thickly settled and cultivated and not semi-desert country.   But the railroad there, as here, proposed to keep the station warm in winter for passengers, proposed to provide a locked place for less than carload lots with available key.   Outbound carload lots would be handled by telephoning orders for cars to either Burley or Rupert, and the manner of proposed handling of bills of lading would be the same as proposed in this case.   The court held that:

"Based upon the finding of the commission that 'public convenience and necessity will require *during the shipping season* the continuation of the maintenance of said reporting agency at Heyburn,' the evidence clearly did not justify the conclusion that the railroad company was not entitled to any relief whatever; and it is apparent from this finding that during the months other than what is termed the shipping season (specified in the findings as from July to November, inclusive) an agent was not required. We are of the opinion, therefore, that the commission did not regularly pursue its authority in failing to allow the discontinuance of the station agent at Heyburn during months of the year not included in the shipping season."

We cannot say as a matter of law from the evidence in this case that the commission should have granted the plaintiff some relief by permitting it to discontinue the agency at St. John during a portion of the year.   There is not sufficient evidence in the record to be able to state conclusively whether, over a series of years, there can be blocked out what may be called a shipping season, but we can say that the commission did not regularly pursue its authority when it refused the application for a rehearing, and thereby refused to take evidence on that question, especially in view of its finding No. 9 which tends to support the assertion that there is a shipping season, and a season when there is very little shipping of carload lots.   The Idaho case cannot be a precedent on the facts because the situation at St. John is different than that at Heyburn, and especially in view of the fact that the railroad filed an application for permission to discontinue the agency at Faust, which is the next station

12.8 miles westerly from St. John. Furthermore, since the commission has the duty to exercise its own judgment on the facts, the opinion of no court on similar facts can be a precedent. In the Idaho case there was a definite finding by the commission that public convenience and necessity required, during the shipping season, an agent; consequently a decision that an agency was required all the year was not supported by the finding. In the instant case, the error of the commission is not in making a decision not supported by the finding, but in not giving a hearing on the possibilities of dispensing with the agency service during a portion of the year at least, and all year, perhaps, if a telephone were installed at St. John Station. The commission in this respect failed to pursue its authority.

The case of *St. Louis & S. F. R. Co.* v. *Newell,* 25 Okl. 502, 106 P. 818, held that an order requiring the railroad to install telephone bulleting service at one of its stations without evidence as to the number of passengers handled at the station and the receipts of the company from that portion of the traveling public was error. Whether the commission makes an order requiring a service on insufficient evidence, or whether it makes an order denying an application without having sufficient evidence to support the denial, can make no difference in principle.

For the reason above mentioned, the order denying the petition for rehearing will be set aside with instructions to the commission to hold a hearing upon the question of whether the installation of the telephone at St. John would satisfy the requirements of the statute as to reasonable and adequate service, and as to whether at all events the petitioner should not be allowed to discontinue the agent for certain months of the year, and to make its findings and render judgment upon those questions.

STRAUP, ELIAS HANSEN, FOLLAND, and EPHRAIM HANSON, JJ., concur.

CHERRY, C. J., did not participate herein.