(No. 27768.—

ILLINOIS CENTRAL RAILROAD COMPANY, Appellee, *vs.* THE ILLINOIS COMMERCE COMMISSION *et al.*, Appellants.

*Opinion filed May 16, 1944—Rehearing denied September 18, 1944.*

GEORGE F. BARRETT, Attorney General, (WILLIAM C. WINES, STEPHEN M. FLEMING, and WILLIAM RUFUS MORGAN, all of Chicago, of counsel,) for appellants.

ELMER A. SMITH, and JOSEPH H. WRIGHT, (VERNON W. FOSTER, and CHARLES A. HELSELL, of counsel,) all of Chicago, for appellee.

Mr. CHIEF JUSTICE SMITH delivered the opinion of the court:

This is an appeal from a judgment of the superior court of Cook county under section 69 of the Public Utilities Act. (Ill. Rev. Stat. 1943, chap. 111⅔, par. 73.) The cause was there heard on appeal from the Illinois Commerce Commission under section 68 of said act. (Ill. Rev. Stat. 1943, chap. 111⅔, par. 72.) On a hearing the trial court set aside the order of the commission. The appeal to this court was .perfected by the commission. The pro-

ceedings involve only intrastate commutation suburban fares in the Chicago suburban area.

A brief reference to the historical background of the proceedings will be helpful to an understanding of the questions involved. Prior to December 9, 1925, the Interstate Commerce Commission granted to the railroads generally a 20 per cent increase in freight and passenger rates throughout the country. This increase did not apply to intrastate suburban rates. Following the granting of this increase by the Interstate Commerce Commission, the Illinois Central Railroad Company filed tariffs with the Illinois Commerce Commission for a corresponding increase in its suburban rates in its Chicago suburban area. On December 9, 1925, after a hearing, the commission denied the 20 per cent increase, but granted a 15 per cent increase, over existing rates.

Thereupon, appellee filed a suit in the Federal District Court for the Northern District of Illinois for an injunction to restrain the commission and certain other public officials from enforcing the order of the commission and from interfering with appellee in putting into effect the proposed 20 per cent increase in such rates. Application for a temporary injunction was heard on December 26, 1925, by a statutory three-judge court. A temporary injunction was issued. Thereafter, on January 7, 1928, the cause was heard on the merits by a like statutory court. A final decree was entered making the injunction permanent. No appeal was taken from that decree. By the decree it was provided:

"That the defendants, and each of them, their attorneys, agents and representatives, their successors in office, and all other persons whatsoever, be perpetually restrained and enjoined from taking any steps whatever to interfere with the right of plaintiff to charge and collect for commutation service rendered in Cook County, Illinois, the fares and charges provided for in Tariffs No. 376 (Illinois Com-

merce Commission No. 700,) and No. 377 (Illinois Commerce Commission No. 701,) filed by the plaintiff with the Illinois Commerce Commission; or from instituting any suits or actions to enforce, so far as plaintiff is concerned, the order of said Illinois Commerce Commission entered on December 9, 1925, in Cause No. 14866 on the docket of said Commission, or from taking any steps or instituting any proceedings to impose fines upon, or recover penalties from, plaintiff because of plaintiff's action in enforcing from and after January 1, 1926, the said tariffs named hereinabove and collecting the fares and charges provided therein."

Under the protection of the temporary injunction issued in that case on December 26, 1926, appellee, on January 1, 1926, put into effect the proposed 20 per cent increase in existing suburban rates and fares in its Chicago suburban area. At that time appellee's suburban service and equipment was operated exclusively by steam power. Some years later it was changed to electrical equipment and power, and has since been operated exclusively as an electric system. With the electrification of the system substantial changes and improvements were made in the service. The increased rates, under the protection of the injunction, were continued until sometime after this change was made.

Beginning in 1936, appellee, from time to time, filed various tariffs with the commission by which certain changes were made in its suburban rates. The rates fixed by these tariffs are referred to in the tariffs themselves, and in the record, as "experimental rates." While these experimental rates were changed from to time, they were always kept below the injunction level of 20 per cent in excess of the rates in force immediately prior to January 1, 1926. The commission did not interfere with appellee in charging these rates or when the rates were either increased or reduced by tariffs filed with the commission. The record

shows that these experimental rates were in force at the time this proceeding was instituted.

On January 21, 1942, the Interstate Commerce Commission granted to the railroads throughout the country, another general increase of 10 per cent in passenger rates and fares within its jurisdiction. At that time a 10 per cent increase in a substantial portion of appellee's prevailing intrastate commutation fares in its Chicago suburban area would not raise those fares above the rates approved by the decree, entered in 1928, in the injunction suit. This order of the Interstate Commerce Commission was a general order applying to all railroads in the United States of the class to which appellee belonged. That order is designated in the record and will be hereafter referred to as *Ex Parte No. 148*.

On January 28, 1942, appellee filed its petition with the Illinois Commerce Commission for authority to file tariffs, on short notice, increasing by 10 per cent its intrastate suburban commutation fares in its Chicago suburban area, effective on the effective date of *Ex Parte No. 148*, which was applicable to its interstate and through rates. The commission refused to grant this authority. Thereupon tariffs were filed by appellee with the commission increasing by 10 per cent its suburban commutation rates between points within the State of Illinois. By the tariffs filed, these rates were to become effective on March 8, 1942. At the same time like applications and tariffs were filed, effecting the same character of rates, by a number of other carriers operating in the Chicago area. The commission entered separate orders suspending the proposed tariffs and docketed each application separately. The tariffs filed by appellee at that time are designated as Nos. 4258 and 4259. (All tariffs are referred to in this opinion by Illinois Commerce Commission numbers, unless otherwise noted.) At the same time appellee filed with the commission Supplement No. 7 to Tariff No. 3755, which merely

provided for the cancellation of the then effective tariffs applicable to such rates.

It is obvious that at the time Tariffs Nos. 4258 and 4259 were filed, appellee was of the opinion that the order of the Interstate Commerce Commission, *Ex Parte No. 148,* authorized it to increase all its rates, both intrastate and interstate, to the extent of 10 per cent, including suburban rates. The Illinois Commerce Commission, however, was of the opinion that *Ex Parte No. 148* did not apply to suburban rates. It based its orders denying authority to file the tariffs on short notice, and its orders suspending the proposed rates, on its construction that *Ex Parte No. 148* did not apply to intrastate suburban rates.

Thereupon, Charles M. Thomson, as trustee of the property of the Chicago and North Western Railway Company, which was one of the carriers against whom one of said suspension orders was entered by the commission, filed a suit in the Federal District Court for the Northern District of Illinois, to enjoin the commission, the Attorney General and other public enforcement officers from taking any steps to prevent said railway company from making effective the proposed increase of 10 per cent, in its intrastate suburban fares, in the Chicago area. By the complaint in that case it was alleged, among other things, that *Ex Parte No. 148* superseded the jurisdiction of the Illinois Commerce Commission and that under said order the plaintiff was authorized to increase its intrastate suburban rates 10 per cent over existing rates, without the approval of the Illinois Commerce Commission. The purpose of the suit was to enjoin the enforcement of the order of the commission disapproving such increase and suspending the proposed rates.

Upon a hearing by a statutory three-judge court, an injunction was granted as prayed for in the complaint. The District Court held that the order of the Illinois Commerce Commission, disapproving the proposed increase of

10 per cent was invalid as to intrastate commutation fares, for the reason that said order was in conflict with *Ex Parte No. 148*, which it was held applied to such rates. By its decree, it perpetually restrained and enjoined the commission and the enforcement officers from enforcing the order and from interfering with the collection of the fares prescribed by the proposed tariffs, filed with the Illinois commission, based upon the 10 per cent increase.

An appeal from that decree was taken by the commission to the Supreme Court of the United States. That court, being in doubt as to the intended scope of the Interstate Commerce Commission's order, *Ex Parte No. 148*, requested that commission to file a brief in the cause, discussing its construction of the meaning and application of said order. In compliance with this request, such brief was filed. In that brief the Interstate Commerce Commission took the position that its order, *Ex Parte No. 148*, was not intended and should not be construed to direct the 10 per cent increase in existing Illinois intrastate commutation fares. In discussing this brief, the court observed, "Although the brief is not wholly free from obscurity surrounding the order itself the Commission's ultimate position that the order is inapplicable to these particular commutation fares is one which, under all the circumstances of the case, we accept." The court held that *Ex Parte No. 148* did not apply to the intrastate commutation rates in the Chicago area, involved in the case. The decree of the District Court granting the injunction was reversed. *Illinois Commerce Com.* v. *Thomson*, 318 U. S. 675, 63 S. Ct. 834.

The decision in the above case obviously disposed of the contention of appellee in this case that *Ex Parte No. 148* was applicable to the rates here involved and that under that order it was entitled to make effective a 10 per cent increase in its suburban commutation fares without au-

thority from the Illinois Commerce Commission. That case was decided April 12, 1943.

The order of the commission involved on this appeal was entered on November 24, 1942. By the order the commission found that the rates proposed in tariffs Nos. 4258 and 4259 were not just and reasonable and said tariffs were permanently suspended and cancelled. It further ordered that the schedule of rates of appellee on file with the commission and in force and effect on March 7, 1942, be continued in effect until the further order of the commission. By the order, appellee was directed to publish, post and file with the commission, effective on or before December 30, 1942, appropriate supplements cancelling Supplement No. 7 to Tariff No. 3755 and also cancelling Tariffs Nos. 4258 and 4259.

Appellee next contends that the decree in the injunction suit entered by the Federal Court in January, 1928, prohibits the commission from interfering with it in raising its intrastate suburban commutation rates to the level of the rates approved by said decree. It further contends that as to a large portion of such rates, which were in effect on March 7, 1942, the increase of 10 per cent would not raise the fares above the rates approved by the injunction decree. These are the rates covered by Tariff No. 4259.

As to approximately 20 per cent of its suburban commutation fares, prevailing on March 7, 1942, which the increase of 10 per cent would raise above the level of the rates approved by that decree, being the rates covered by Tariff No. 4258, appellee contends that, wholly apart from the action of the Interstate Commerce Commission, by *Ex Parte No. 148*, and entirely aside from the proceedings in said injunction suit, the evidence in this record justifies the proposed increase of 10 per cent, which the commission disapproved. In other words, appellee challenges the jurisdiction of the commission to make any order at all

with reference to the rates proposed in Tariff No. 4259, which are within the injunction level. It asserts that the only rates which it was required to justify are the rates proposed by Tariff No. 4258, which it seeks to raise above the level of the injunction. It further contends that even though it be held that it also had the burden of justifying the rates proposed in Tariff No. 4259, it has discharged that burden by the evidence in this record.

Before entering upon a consideration of this and other questions in the case, it will be necessary to dispose of a procedural contention raised by appellant. It is contended that the commission was without jurisdiction to grant an increase in rates for the reason that appellee failed to notify the Federal Emergency Price Administrator of the pendency of the proceedings, as required by the amendment to the Emergency Price Control Act of 1942, passed by the Second Session of the Seventy-seventh Congress, and the regulations promulgated under said act. This amendment to the Emergency Price Control Act, which became effective on October 2, 1942, contains the following provision: "* * * Provided, That no common carrier or other public utility shall make any general increase in its rates or charges which were in effect on September 15, 1942, unless it first gives thirty days notice to the President, or such agency as he may designate, and consents to the timely intervention by such agency before the Federal, State, or municipal authority having jurisdiction to consider such increase." Public Law 729—77th Congress— 2nd Session; 50 U. S. C. A. 901; U. S. C. A. Congressional Service, 1942, No. 9, p. 1202.

On October 14, 1942, the Director of Economic Stabilization issued his Directive No. 1, in which he designated the Price Administrator of the Office of Price Administration as a representative of the Director of Economic Stabilization, to receive notice of proposed increases in

common carrier or other public utility rates, to issue appropriate regulations for the receipt of such notices and to intervene and participate in proceedings before Federal, State and municipal authorities, in connection with any proposed increase in such rates and charges.

In answer to this contention of appellant, appellee first contends that it was not required to notify the Office of Price Administration as provided in said act, for the reason that the increase in rates which it sought was not a "general increase," within the meaning of the Emergency Price Control Act, as amended on October 2, 1942. A reference to the amendment discloses that by its broad language the Congress conferred upon the President practically unlimited administrative powers. In the exercise of those powers the Office of Price Administration on November 12, 1942, issued Procedural Regulation 11. Section 1300.902 of that regulation provides:

*"General requirements with respect to notices.* Thirty (30) days before the effective date of a general increase in the rates or charges of any common carrier or other public utility, there shall be filed with the Transportation and Public Utilities Division of the Office of Price Administration, Washington, D. C., two copies of notice of such proposed increase, except as otherwise provided in paragraphs (d) and (e) of section 1300.904. Such notices shall be deemed to have been filed when received in the Office of such Division. If authority for the establishment of any such increase is required by any regulatory agency, notice shall be given on or before the time such authority is sought in order that the Price Administrator may have timely opportunity to intervene, but in no event shall such notice be given less than 30 days before such proposed increased rates or charges are to become effective. All notices shall state the name and address of the Federal, State or municipal authority having jurisdiction over the rates or charges in question.

"Each such notice shall contain a statement that the common carrier or other public utility consents to the timely intervention by the Price Administrator, on behalf of the Director of Economic Stabilization, before the Federal, State or municipal authority having jurisdiction to consider such increase.

"One copy of each notice must be over the signature of an executive officer, a responsible traffic officer, or a duly authorized attorney or agent of the carrier or other public utility. Duly authorized officers of corporate agents shall sign on behalf of such agents. The person signing the notice shall certify that the information contained therein is true to the best of his knowledge, information and belief."

By section 1300.901 of the regulation the term "general increase" in the rates or charges of a common carrier or other public utility is defined as "any change in its rates, fares, classifications, rules, regulations or practices which results in an increase in the charges for transportation or other public utility service applicable to a class of passengers, shippers or customers, including increases in wholesale or industrial rates or charges for public utility services, as distinguished from an increase of rates or charges applicable to a particular customer or transportation service under special arrangement."

In view of the broad general powers granted to the President by the Emergency Price Control Act and by the amendment of October 2, 1942, to said act, we are of the opinion that this regulation, defining what shall constitute a "general increase" in common carrier or utility rates, within the meaning of the act, was not beyond the powers conferred. We, therefore, conclude that the proposed increase in rates sought by appellee was a "general increase" within the language and meaning of the amendment of October 2, 1942, to the Emergency Price Control Act. We are further of the opinion that appellee was required to give the notice prescribed by said amendment, unless it was

relieved from so doing by the fact that the proceedings in this cause were instituted and the hearings had been concluded prior to the effective date of the amendment.

This brings us to the contention of appellee that it was not required to give notice to the Federal Emergency Price Administrator, as required by said amendment, for the reason that the proceedings herein were instituted and had proceeded to the point where the taking of evidence had been concluded and the case taken by the commission for decision, before the provisions of the Emergency Price Control Act, relied upon by appellant, became effective.

The record shows that the proceedings here involved were instituted before the commission on February 6, 1942. Following that date, various successive temporary suspension orders were entered. By these several suspension orders, the proposed rates were suspended for a total period of ten months, from February 6, 1942. Hearings were had before the commission during the months of March, April and May, 1942. On May 16, 1942, the hearings were concluded and the case was marked "Heard and Taken," by the commission. The amendment to the Emergency Price Control Act of 1942 was passed by Congress on October 2, 1942. The provision with reference to carrier and other utility rates was not in the Emergency Price Control Act of 1942, as originally enacted on January 30, 1942. (50 U. S. C. A. 901.) That provision was first brought into the act by the amendment passed on October 2, 1942.

No question is raised but what appellee gave to all parties entitled thereto all notices required by statute at the time the proceedings were instituted. The jurisdiction of the commission was then lawfully invoked according to the statute, upon proper notice. Having invoked the jurisdiction of the commission in a statutory proceeding, in the manner provided by the statute, and having given notice, in accordance with the statute, to all parties who were,

at the time the proceedings were instituted, entitled to such notice, we are not impressed with the argument that either the jurisdiction of the commission, or the proceedings, could be affected by the failure to notify some other party who was not, at the time the proceedings were instituted, entitled to any notice at all. The amendment to the Emergency Price Control Act was not passed until several months later. It was not retroactive. It seems to us that it was not contemplated that, in any event, the failure of a carrier to comply with the provisions of the Emergency Price Control Act should affect the jurisdiction of a State commission or other regulatory body. The failure to give the required notice certainly could not affect such jurisdiction lawfully acquired prior to the adoption of the amendment to the Emergency Price Control Act. Its obvious purpose was to give to the agency designated by the President an opportunity to be heard before such commissions in cases involving increases of carrier and utility rates and to enable such agency to appear and oppose the granting of such increases if it was felt that such appearance was necessary. Rather than restricting or limiting the jurisdiction of such regulatory bodies, the act enlarges their jurisdiction so as to permit a government agency to appear and be heard, which was a right not theretofore given to such agencies.

The order in this case did not grant, but on the contrary, denied, increases in rates. It may well be that if the commission had entered an order allowing the increases, then, because of the posthumous passage of the amendment of October 2, 1942, to the Emergency Price Control Act after the hearings were concluded and before the order was entered, before the increased rates could be put into effect appellee would be required to notify the Office of Price Administration, in accordance with that amendment. In no event was this a matter which would affect the jurisdiction of the commission to proceed in a

pending case. Had the proposed increased rates been granted by the commission after the effective date of the amendment, it might be argued that appellee could not make such increased rates effective without complying with the amendment. The negative order of the commission, here involved, denying the proposed increase in rates, in nowise affected the right of the Office of Price Administration to be heard in opposition to the proposed increase in rates. The most that could be said of appellee's failure to notify the Office of Price Administration, after the 1942 amendment became effective, is that it would not have been in a position to have made effective an increase in rates, had such increase been granted by the Illinois commission, until it had also complied with the Emergency Price Control Act. The necessity of approval of rates by both a State and Federal authority is not unusual. In our opinion, the contentions of appellant, on this branch of the case, cannot be sustained.

In the logical sequence of the issues presented, this brings us to the question of the effect of the injunction issued by the Federal District Court on December 26, 1925, and made permanent by the final decree of that court, entered on January 7, 1928. The record shows that on January 1, 1926, under the protection of the temporary injunction, appellee, by Tariff No. 700, increased its commutation suburban fares 20 per cent above the rates existing prior to that date.

The record shows that the rates which were put into effect, as of January 1, 1926, under the protection of the injunction, were continued in force until 1936. On September 18, 1936, appellee filed with the commission, Tariff No. 3537. By this tariff, which became effective on that date, the existing rates which became effective on January 1, 1926, under the protection of the injunction, were reduced approximately 20 per cent. Certain other adjustments were made. It was stated in the tariff that these

rates were established for experimental purposes. By other tariffs filed subsequent to September 18, 1936, other changes and adjustments were made in existing rates.

As already stated, on March 8, 1942, appellee filed Tariffs Nos. 4258 and 4259, by which all suburban commutation fares were increased approximately 10 per cent for the alleged purpose of meeting wartime increases in costs of operation. The rates proposed by Tariff No. 4258 were those which a 10 per cent increase in the existing suburban rates would raise above the rates which became effective on January 1, 1926, under the protection of the injunction. The rates proposed by Tariff No. 4259, however, were those which the proposed increase in the existing rates would not raise above the rates which became effective on January 1, 1926, under the protection of the injunction. By Tariff No. 4259, where a 10 per cent increase in existing rates would result in higher fares than those which became effective on January 1, 1926, such fares were, by that tariff, increased up to, but not in excess of, the rates effective on January 1, 1926. In other words, the rates proposed in Tariff No. 4259 were all within the injunction level.

It is the contention of appellee that the injunction decree is still effective and prohibited the commission from interfering with appellee in, or exercising its jurisdiction to prevent appellee from, increasing its fares up to the level of the rates approved by that decree, and which became effective as of January 1, 1926.

As to Tariff No. 4259, appellee contends that it is governed solely by the injunction decree. It further contends that as to those rates, it is not subject to the authority or orders of the commission, as long as it does not raise the rates above the level of the rates approved by that decree.

It is true that the final decree entered in January, 1928, made the injunction theretofore issued permanent. No

appeal was taken from that decision. It was, and is, binding upon all of the parties to the record. Nevertheless, the relation of the rates, approved by that decree, to the service rendered at that time, cannot be disregarded. In construing that decree and in determining its effect, we must take into consideration the character of the service which was within the contemplation of the decree. Undoubtedly the decree is binding and has perpetual efficacy as to the rates and service involved in that case. The record shows, however, that since that time both the service and the rates have been materially changed. At that time appellee's suburban system was operated by steam, and was, to all intents and purposes, a steam railroad. Since then the system has been completely electrified. It is now operated as an electric system. The service rendered is vastly different from the service for which the rates were authorized by the 1928 decree. The fact that appellee, in 1936, by Tariff No. 3537, voluntarily reduced the rates protected by the injunction decree to the extent of 20 per cent, constitutes an admission by appellee that its operating cost had been materially decreased. The adjustments thereafter made in the rates, prior to March 8, 1942, even though such adjustments were made for experimental purposes, indicate that the operating cost was constantly changing. The voluntary 20 per cent reduction, made in 1936, is conclusive that appellee had not only materially changed the service, but had also experienced a reduction in operating cost. There can be no contention upon this record that the service rendered by appellee for the past several years is not of a wholly different character from the service rendered at the time the injunction decree was entered in 1928. The decree is effective only as to the rates permitted for the same character of service which was being rendered at the time the decree was entered. The value of the property devoted to the rendition

of the services at the time the decree was entered must also be considered with reference to the present value of the property devoted to the present service.

In 1936, appellee realizing that it was not entitled to charge, for the service rendered at that time, the same rates which it was permitted to charge for the different service which it was rendering at the time the decree was entered, voluntarily reduced those rates 20 per cent. It thus voluntarily abandoned the rates approved by the decree and sought to adjust such rates independently of the decree, upon the basis of the service rendered and the cost of operation at that time. It is true the decree established only a maximum rate within which the commission could not interfere. There was nothing in the decree to compel appellee to charge the maximum rates approved by the decree. Nevertheless, when it determined in 1936, that its rates were too high, and to voluntarily submit to a reduction, we think this constituted an abandonment of the maximum rates fixed by that decree. We know of no rule of law which would permit one party to litigation to obtain a decree for his protection and then, after he has voluntarily disregarded and relinquished his reliance upon the decree over a period of years, again enforce the decree against the other party, when conditions have so changed as to make the enforcement of the decree desirable and favorable to him. The filing of the subsequent tariffs with the commission, whenever any changes in rates were proposed, was a recognition of the jurisdiction and authority of the commission, notwithstanding the decree.

An injunction does not create a right. It merely protects the rights of plaintiff from unlawful or injurious interference. In thus preventing, it does not give a perpetual or vested right in the remedy, the law governing the injunction, or the effect of it. The plaintiff is not entitled to the same measure of protection at all times and under all circumstances. An injunction decree which is

entered upon facts which are not of such a permanent character as to be substantially impervious to change, is both executory and ambulatory. It marches along with time. 28 Am. Jur., sec. 314, p. 485.

In *United States* v. *Swift & Co.* 286 U. S. 106, 52 S. Ct. 460, it was said: "A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need. (*Ladner* v. *Siegel*, 298 Pa. 487, 494, 495, 148 A. 699, 68 A. L. R. 1172; *Emergency Hospital* v. *Stevens*, 146 Md. 159, 126 A. 101; *Larson* v. *Minn. N. Electric Ry. Co.* 136 Minn. 423, 162 N. W. 523; *Lowe* v. *Prospect Hill Cemetery Ass'n*, 75 Neb. 85, 106 N. W. 429, 108 N. W. 978.) The distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative."

In the case of *Smith* v. *Illinois Bell Telephone Co.* 270 U. S. 587, 46 S. Ct. 408, the same rule was announced. In that case the telephone company brought the suit against the members of the Illinois Commerce Commission and the Attorney General to enjoin them from enforcing or attempting to enforce a schedule of rates alleged to be confiscatory, and from taking any steps or proceedings against the company to prevent it from collecting rates and charges under another and higher schedule. A permanent injunction was granted in accordance with the prayer of the complaint by the District Court for the Southern District of Illinois. The purpose of the suit and the provisions of the decree were substantially identical with the suit and the decree relied upon in this case. On appeal to the Supreme Court the members of the Commerce Commission argued that the effect of the decree was to prohibit them from enforcing in the future, any legislative remedy for excessive charges thereafter imposed, within the level of

the decree, however unreasonable such charges might be. In other words the contention was that the injunction decree ousted the commission of authority and jurisdiction to supervise and regulate the rates of the utility in the future. In answering this argument the court said, "there is nothing in the decree, rightly construed, which attempts to curtail or could curtail the legislative or rate-making powers of appellants to proceed hereafter under the State law, subject to such limitations, if any, as may be required by the doctrines of *res judicata,* ordinarily applicable in such cases."

The same rule applies to the decree relied upon in this case. It must be construed as applying to the conditions existing at the time the decree was entered. Any attempt to apply that decree to a subsequent change in conditions or to a different service or rates, is governed solely by the rules of law applicable to the doctrine of *res judicata.*

It is our conclusion that, in view of the fact that appellee has entirely changed the character of its system and equipment, as well as the service rendered, and the further fact that it, in 1936 and subsequently, voluntarily abandoned the maximum rates approved by the decree, it is not now in a position to enforce or invoke the decree as taking from the commission its jurisdiction over the rates here involved. In our judgment this case must be determined upon the showing as to facts now existing, just as though the injunction decree had never been entered, subject only to the rules of law applicable to the doctrine of *res judicata.*

This brings us to the consideration of the question of whether the order of the commission, here involved, was unreasonable or unlawful. It was found by the trial court to be both unreasonable and unlawful. The basis for such finding was that insufficient findings were made; that the order has no substantial foundation in the evidence; that

the commission exceeded its power and that the order is contrary to law. The order was set aside.

The limitations imposed upon the courts in reviewing orders of the commission are well defined. The law is settled that the matter of rate regulation is essentially legislative. The fixing of rates is not a judicial function. The jurisdiction of the courts to review the orders of the commission, acting under authority delegated to it by the legislature, is limited to the determination of whether or not it acted within the scope of its authority, or whether the order is without substantial foundation in the evidence, or whether a constitutional right of the utility has been infringed upon by fixing rates which are confiscatory or insufficient to pay operating expenses and leave for the utility a reasonable return on the present value of its property, used and useful, in the public service. (*Chicago, Milwaukee and St. Paul Railway Co.* v. *Public Utilities Com.* 268 Ill. 49; *Public Utilities Com. ex rel. Mitchell* v. *Chicago and West Towns Railway Co.* 275 Ill. 555.) If the order of the commission does not contravene any constitutional limitation or rule of law and is within the constitutional and statutory authority of the commission, and has a substantial basis in the evidence, it cannot be set aside by the courts. *Public Utilities Com. ex rel. City of Springfield* v. *Springfield Gas and Electric Co.* 291 Ill. 209; *Public Utilities Com. ex rel. Allis Brick Co.* v. *Chicago, Milwaukee and St. Paul Railway Co.* 287 Ill. 412; *Chicago Motor Bus Co.* v. *Chicago Stage Co.* 287 Ill. 320; *Public Utilities Com. ex rel. Chicago· Board of Trade* v. *Toledo, St. Louis and Western Railroad Co.* 286 Ill. 582; *Public Utilities Com. ex rel. East St. Louis Stone Co.* v. *Terminal Railroad Ass'n,* 281 Ill. 181.

The courts will not set aside an order of the commission unless it is arbitrary or unreasonable or clearly violates some rule of law. The purpose of a review of orders of

the commission by the courts is to keep the commission within its jurisdiction so as not to violate any rights guaranteed by the constitution. *South Chicago Coal and Dock Co.* v. *Commerce Com.* 365 Ill. 218; *Commerce Com. ex rel. Lumaghi Coal Co.* v. *Chicago and Eastern Illinois Railway Co.* 332 Ill. 243.

The legislature has vested in the Commerce Commission the exclusive function of fixing rates of public utilities which will be just and reasonable and produce a fair return on the property used and employed in the public service. Even though a court holds that the rates authorized by the commission are inadequate or illegal and restrains their enforcement, it cannot make new rates. Orders of the commission are entitled to great weight and the courts will not set aside such orders unless they are arbitrary or unreasonable or clearly violate some rule of law. *Peoples Gas Light and Coke Co.* v. *Slattery,* 373 Ill. 31.

With these limitations in mind, we proceed to a consideration of the order here involved. The only evidence before the commission was that offered by appellee. As already indicated, the rates involved are those only which are applicable to appellee's suburban service in the Chicago suburban zone. Substantial evidence was offered before the commission showing that appellee's suburban service is operated as a separate service, distinct from its system service. There was no evidence offered to the contrary. This evidence shows that the suburban service originated in 1856. At that time the operations extended from Randolph street to Hyde Park (53d street.) In 1862 it was extended to Woodlawn (63d street); in 1871 to Grand Crossing (75th street); in 1873 to Kensington (115th street); in 1880 to Pullman; in 1890 to Harvey and Homewood; in 1892 to Blue Island; in 1893 to South Chicago; in 1900 to Flossmoor, and in 1912 to Matteson, which is its present southern terminus.

The track arrangements used in the suburban service includes three tracks from Randolph street to Eleventh street; six tracks from Eleventh street to Fifty-first street, which connect with the Fifty-third street station; four tracks from Fifty-third street to Kensington; two tracks from Kensington to Matteson; a single track between Kensington and Blue Island, and two tracks from Sixty-seventh street to South Chicago. These tracks are used exclusively for suburban service. They are not used for through freight or passenger service. The distance from Randolph street to Matteson is 28 miles; from Randolph street to South Chicago, 11.6 miles; from Randolph street to Blue Island, 18.3 miles. All stations are used exclusively in the suburban service, except five, namely; Fifty-third street, Kensington, Harvey, Homewood and Matteson. A portion of the facilities of these five stations is used jointly for both suburban and through service.

The equipment includes a total of 280 motor cars and trailers. They are operated in multiples of two, except during rush hours, during which time from two to eight cars are used in each train. The entire suburban system is electrified and all trains are operated by electricity. Separate shop facilities are maintained for suburban equipment. Separate yards are used exclusively for suburban operations. All suburban stations are equipped with a special type of platform so that passengers are enabled to enter and leave the cars without using steps. The platforms of cars and stations are of the same height. The operations consist of 458 trains per day on week days, and 289 trains on Sundays. Twenty-four-hour service is provided. Seven hundred seventy-four employees are engaged exclusively in the suburban service. These employees include station janitors, matrons, crossing flagmen, trainmen, engineers, gatemen, collectors, flagmen, yardmasters, switchmen, levermen, clerks, mechanics, carmen, electricians, oilers, car

cleaners, hostlers and foremen. Since 1925, appellee has completely reconstructed its suburban system by a change-over from a steam-operated suburban service to electrified service, devoted exclusively to the handling of suburban traffic. No through trains make use of the suburban facilities. Except as to the five stations above mentioned, no suburban trains use facilities which are used by through trains. There is no interchangeability of either equipment or manpower.

Evidence was offered on the question of values of property used and useful, in both the suburban and through service, allocating to each its just proportion of property used jointly in both branches of service. Joint expenses were in like manner allocated. The evidence touching the question of the value of the property, used and useful and devoted to the suburban service, tended to show that, under any formula approved by the Supreme Court in *Federal Power Com.* v. *Natural Gas Pipeline Co.* 315 U. S. 575, 62 S. Ct. 736, for arriving at such values, the present rates would not produce a fair return on the investment. The commission disregarded this evidence in its entirety. It refused to consider or to attempt to segregate or allocate these values and expenses, as between the suburban and through service. Instead, it proceeded upon its conclusion that, notwithstanding this undisputed evidence in the record, the suburban service did not constitute a separate and independent service and that the commission could not consider the suburban service separately. It proceeded upon the theory that the only question to be determined was whether the revenues derived from the entire system, both freight and passenger, through and suburban, and including both interstate and intrastate business, were sufficient to yield a fair return on the value of the properties used in its entire system, wherever located. Its findings and order are based on the premise that if the combined revenues from all sources from the entire system were

sufficient to produce a reasonable return on the fair value of its property, devoted to the public service by the entire system, the return from its property devoted to its suburban service was wholly immaterial, and that it would not attempt to determine whether, under existing rates, appellee was conducting its suburban service at a loss, or less than a reasonable return upon the investment employed in that service.

The commission asserted that it took this position because there was evidence in the record that the income from the suburban service goes into and is treated as a part of the general corporate funds, and that all expenses for materials and supplies and disbursements, in connection with the operation of the suburban service, were paid out of the general corporate funds, and upon the further fact that some of the facilities were used jointly for both suburban and through service.

Exhibits and testimony were offered by appellee, setting forth in detail the allocation of joint operating expenses and taxes. To these exhibits were attached the formulas constituting the bases of the division and apportionment of joint expenses to suburban and through service. These exhibits set out in detail the allocation applicable to each joint account and the basis for the allocation. The allocation of property values used jointly in both branches of service was shown in the same way. Such values were allocated on the same basis.

The commission apparently attached some importance to the fact that the evidence showed that the income from suburban service was treated as a part of the general corporate funds of appellee. This fact, however, is wholly without significance. It could not be treated otherwise. The entire income from all branches of service, and any other possible sources, constituted its general corporate funds. The important fact is that, nevertheless, the accounts were kept separately, even though the income from

all classes of service ultimately became a part of the general corporate funds. The commission failed to distinguish between corporate funds and corporate accounts.

The dominant basis of the order of the commission is its finding in paragraph III "that the suburban service is in fact but a segment of the entire Illinois Central System and it therefore cannot consider the suburban service as an institution in and by itself." Later, in discussing property values, its views are expressed in the following language: "In view of the investment in the property of Petitioner, as disclosed by the record, and hereinabove set forth and referred to, there can be no doubt but that the Petitioner is earning and will continue to earn during the war emergency a just and reasonable return upon the property investment account, because it must be assumed, in view of the relation of the capital structure and funded debt account to the property investment account, that operating revenue to the extent of approximately $12 per share on the common stock of the Petitioner would constitute a just and reasonable return, at least during the period of the war emergency, if not thereafter, during the period in which a somewhat approximate return is realized by the Petitioner. The fact that the net return realized by the Petitioner from the suburban service may not equal the corresponding return from the freight and other services rendered by Petitioner on its system as a whole, is of minor importance, having in mind that the system revenue derived by Petitioner is sufficient to yield to the investors what would appear to be a just and reasonable return."

In paragraph VI of the order, the commission found: "The Commission has hereinabove set forth its opinions and findings to the effect that the services rendered by Petitioner in its suburban service cannot be segregated and treated apart from its system service, but on the contrary constitute an integral part of its system service and should be so considered in determining whether a just return upon

investment of Petitioner's system as a whole is presently accruing. Accordingly, the Commission is of the opinion and so finds that the proposed rates involved herein are and must be held to be unjust and unreasonable."

It will, therefore, be seen that the commission definitely refused to give consideration to the suburban service as separate from the system service of appellee. It found that, taking into consideration the operation and revenues of the entire system, appellee was receiving a reasonable return from its whole system upon its system investment. Having reached this conclusion, it further found that the question of whether or not the suburban service, as a separate service or system, was earning a return on the investment devoted to that system was wholly immaterial. It refused to consider the question of whether the revenues from suburban service were remunerative or confiscatory, or whether such revenues were sufficient to pay operating expenses. It thus refused to consider the fair value of appellee's property devoted to the suburban service, as well as the income derived from that service.

In reaching this conclusion, the commission wholly disregarded both the law and the evidence. It was fundamentally wrong, as a matter of law, in refusing to consider the evidence in the record showing that the suburban service was an independent service, separate from the system service of the company. Its refusal to consider the evidence tending to show that the revenue derived from the suburban service was insufficient to pay operating expenses and provide a reasonable return on the investment, constituted a denial of due process.

One of the leading cases on this subject is *Northern Pacific Railway Co.* v. *North Dakota,* 236 U. S. 585, 59 L. ed. 735. In that case the State of North Dakota had established maximum intrastate rates for the transportation of car-lot shipments of coal. It was there said: "But a different question arises when the State has segregated

a commodity, or a class of traffic, and has attempted to compel the carrier to transport it at a loss or without substantial compensation, even though the entire traffic to which the rate is applied is taken into account. On that fact being satisfactorily established, the presumption of reasonableness is rebutted. If in such a case there exists any practice, or what may be taken to be (broadly speaking) a standard of rates with respect to that traffic, in the light of which it is insisted that the rate should still be regarded as reasonable, that should be made to appear. As has been said, it does not appear here. Frequently, attacks upon State rates have raised the question as to the profitableness of the entire intrastate business under the State's requirements. But the decisions in this class of cases furnish no ground for saying that the State may set apart a commodity or a special class of traffic and impose upon it any rate it pleases, provided only that the return from the entire intrastate business is adequate. * * * The constitutional guaranty protects the carrier from arbitrary action and from the appropriation of its property to public purposes outside the undertaking assumed; and where it is established that a commodity, or a class of traffic, has been segregated and a rate imposed which would compel the carrier to transport it for less than the proper cost of transportation, or virtually at cost, and thus the carrier would be denied a reasonable reward for its service after taking into account the entire traffic to which the rate applies, it must be concluded that the State has exceeded its authority."

In *Norfolk and Western Railway Co.* v. *Conley*, 236 U. S. ·605, 59 L. ed. 745, it was said: "* * * the devotion of the property of the carrier to public use is qualified by the condition of the carrier's undertaking that its services are to be performed for reasonable reward; and that the state may not select a commodity or class of traffic, and · instead of fixing what may be deemed to be reasonable com-

pensation for its carriage, compel the carrier to transport it either at less than cost, or for a compensation that is merely nominal. These considerations are controlling here. The passenger traffic is one of the main departments of the company's business; it has its separate equipment, its separate organization and management, and, of necessity, its own rates. In making a reasonable adjustment of the carrier's charges, the state is under no obligation to secure the same rate of return from each of the two principal departments of business, passenger and freight; but the state may not select either of these departments for arbitrary control. Thus, it would not be contended that the state might require passengers to be carried for nothing, or that it could justify such action by placing upon the shippers of goods the burden of excessive charges in order to supply an adequate return for the carrier's entire service."

In *Banton* v. *Belt Line Railway Corp.* 268 U. S. 413, 45 S. Ct. 534, the question of separate classes of traffic of the same general character was also involved. It was there said: "There is involved only the rates applicable to a part of the company's business. In this respect, the case is similar to *Northern Pacific Railway* v. *North Dakota,* 236 U. S. 585, 35 S. Ct. 429, 59 L. ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1, *Norfolk and Western Railway* v. *West Virginia,* 236 U. S. 605, 35 S. Ct. 437, 59 L. ed. 745, and *Northern Pacific Railway* v. *Department of Public Works of Washington,* 268 U. S. 39, 45 S. Ct. 412, 69 L. ed. 836, decided April 13, 1925. The applicable law is plain. The state is without power to require the traffic covered by the fare enjoined to be carried at a loss or without substantial compensation over its proper cost. And such cost includes not only the expenditures, if any, incurred exclusively for that traffic, but also a just proportion of the expenses incurred for all traffic of which that in question forms a part. The cost of doing such business is not, and properly cannot be, limited to the amount by

which total operating expenses would be diminished by the elimination of, or increased by adding, the transfer passengers in question. It would be arbitrary and unjust to charge to that class of business only the amount by which the operating expenses were, or would be, increased by adding that to the other traffic carried. Outlays are none the less attributable to transfer passengers because also applicable to other traffic. Operating expenses which are incurred on account of all passengers carried, and which are not capable of direct allocation to any class, should be attributed to the transfer passengers in question in like proportion as such expenses are fairly chargeable to other passengers receiving like service. While the carrier has no constitutional right to the same rate or percentage of return on all its business, the state may not select any class of traffic for arbitrary control and regulation."

In *Chicago, Milwaukee and St. Paul Railway Co.* v. *Public Utilities Com,* 274 U. S. 344, 47 S. Ct. 604, the court considered the validity of an order of the Idaho commission affecting intrastate rates for the transportation of logs. There the State commission took the position that even if it be conceded that the particular rates involved were insufficient to produce a return on the invested capital, it did not necessarily follow that the rates would be confiscatory for the reason that the hauling of logs from the forest to the mill constituted only one step in the process of reducing the logs to the finished product. It further found that the revenues derived from the shipment of logs was only an incident to the traffic and could not be considered as an independent service, but only in connection with the entire revenues earned in the transportation of logs and lumber. The court, however, in refusing to accept this theory said: "The evidence introduced by the carriers was sufficient to warrant, if not to require, a finding that, as to the lines of all petitioners, the intrastate log rates in question are very low in comparison

with the rates on other commodities, and that, as to the Chicago, Milwaukee & St. Paul and the Great Northern, they are confiscatory. But, as appears from their opinons, the respondent and the court refused to consider and give weight to that evidence because, as they held, the intrastate log rates were not to be dealt with separately but were to be considered in connection with the interstate lumber rates, and because the carriers made no showing as to the gains or losses resulting from the interstate transportation. That cannot be sustained. The carriers cannot maintain interstate lumber rates higher than otherwise justified by showing that they suffer loss or have inadequate returns from the intrastate transportation of logs. The state has no power to require petitioners to haul the logs at a loss, or without compensation that is reasonable and just, even if they receive adequate revenues from the intrastate log haul and the interstate lumber haul taken together. *Northern Pacific Railway Co.* v. *North Dakota,* 236 U. S. 585, 595, 596, 35 S. Ct. 429, 59 L. ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1; *Norfolk and Western Railway* v. *Conley,* 236 U. S. 605, 609, 35 S. Ct. 437, 59 L. ed. 745; *Brooks-Scanlon Co.* v. *Railroad Com.* 251 U. S. 396, 399, 40 S. Ct. 183, 64 L. ed. 323; *Northern Pacific* v. *Dept. Public Works,* 268 U. S. 39, 43, 45 S. Ct. 412, 69 L. ed. 836; *Banton* v. *Belt Line Railroad Corp.* 268 U. S. 413, 421, 45 S. Ct. 534, 69 L. ed. 1020."

In the case of *Smyth* v. *Ames,* 169 U. S. 466, 42 L. ed. 819, the court considered a statute of the State of Nebraska, fixing rates for intrastate transportation within the State. It was here said: "In our judgment, it must be held that the reasonableness or unreasonableness of rates prescribed by a state for the transportation of persons and property wholly within its limits must be determined without reference to the interstate business done by the carrier, or to the profits derived from it. The state cannot justify unreasonably low rates for domestic transportation, consid-

ered alone, upon the ground that the carrier is earning large profits on its interstate business, over which, so far as rates are concerned, the state has no control. Nor can the carrier justify unreasonably high rates on domestic business upon the ground that it will be able only in that way to meet losses on its interstate business. So far as rates of transportation are concerned, domestic business should not be made to bear the losses on interstate business, nor the latter the losses on domestic business. It is only rates for the transportation of persons and property between points within the state that the state can prescribe; and when it understakes to prescribe rates not to be exceeded by the carrier, it must do so with reference exclusively to what is just and reasonable, as between the carrier and the public, in respect to domestic business. The argument that a railroad line is an entirety; that its income goes into, and its expenses are provided for out of, a common fund; and that its capitalization is on its entire line, within and without the state,—can have no application where the state is without authority over rates on its entire line, and can only deal with local rates and make such regulations as are necessary to give just compensation on local business."

It is true, as asserted by appellant, the court in the recent cases of *Federal Power Commission* v. *Natural Gas Pipeline Co. of America,* 315 U. S. 575, 62 S. Ct. 736, and *Federal Power Com.* v. *Hope Natural Gas Co.* (decided January 3, 1944,) 64 S. Ct. 281, departed somewhat from some of the principles announced in *Smyth* v. *Ames,* relative to the selection of formulas for valuation purposes. It did not, however, depart from the decision with reference to the principle of the segregation of the particular class of service involved from other services rendered by a carrier for rate-making purposes.

From the foregoing cases, it is apparent that the commission in this case disregarded a fundamental rule of law,

applicable to the questions before it. It further appears that the order of the commission was based upon this misapprehension of that principle of law which was binding upon the commission. As a result, the commission wrongfully refused to consider the evidence showing that the service rendered by appellee, in its suburban service, was segregated and separate from its system service. Its finding on which its order was based, that the suburban service constituted an integral and inseparable part of the service rendered by the entire system, has no substantial basis in the evidence. Its finding that so long as appellee's net revenues from the operation of its entire system were sufficient to provide a reasonable return on its system investment it was immaterial whether the revenue derived from its suburban service was sufficient to pay operating expenses incurred in that service or a fair return on the reasonable value of the property devoted to that service, was against the manifest weight of the evidence. Having proceeded upon this fundamentally erroneous basis, it logically reached the erroneous conclusion that it could not consider an increase in rates for appellee's suburban service so long as the net revenue from the entire system was sufficient to show that the whole system was not operating at a loss. This conclusion makes it unnecessary for us to consider any other questions presented which have not already been disposed of by this opinion.

The commission having disregarded the evidence in the record, as well as the basic and fundamental rules of law applicable to the facts before it, its order cannot be sustained. The order of the commission has no substantial basis in the evidence. It is unreasonable and unlawful. The judgment of the superior court of Cook county is affirmed.

*Judgment affirmed.*