(No. 40075.—

CHAMPAIGN COUNTY TELEPHONE Co. *et al.*, Appellants, *vs.* ILLINOIS COMMERCE COMMISSION *et al.*, Appellees.

*Opinion filed May 18, 1967.*

CHAPMAN AND CUTLER, and MEYER, CAPEL & HIRSCH-FELD, both of Chicago, (JOHN N. VANDER VRIES, JAMES L. CAPEL, JR., and DANIEL J. KUCERA, of counsel,) for appellants.

WILLIAM G. CLARK, Attorney General, of Springfield, (EDWARD G. FINNEGAN, Assistant Attorney General, of counsel,) for appellee Illinois Commerce Commission.

JOHN ROBERT JONES, of Columbus, Ohio, and ELMER NAFZIGER, of Springfield, for appellee General Telephone Company.

Mr. JUSTICE HOUSE delivered the opinion of the court:

The appeal to this court is from a judgment of the circuit court of Hardin County confirming orders entered by the Illinois Commerce Commission with respect to the division of revenues from toll telephone messages and dismissing the appeal of the plaintiff telephone companies.

Plaintiffs are fourteen small telephone systems, ten of which are privately owned utilities and four are co-operatives, operating 41 exchanges in central and southern Illinois. Local service is provided by each to its subscribers for a fixed monthly rate depending on class of service. Each

system is available to subscribers and others for toll calls on a per-message charge based on distance, time of day and length of message. In some instances they furnish part of a toll line, but do not operate toll centers (where messages are routed, timed, and recorded). Defendant, General Telephone Company of Illinois, owns and operates toll centers with toll lines connected to plaintiffs' exchanges and some toll lines between toll centers and areas served by General. (General's toll centers perform the function for practically all of plaintiffs' exchanges.) However, the principal toll lines in Illinois are operated by Illinois Bell Telephone Company or its parent, American Telephone and Telegraph Company (AT&T). The Bell System operates toll centers and a toll-line network throughout the country.

General's exchanges are connected by toll lines with exchanges of Illinois Bell and other companies. All telephone companies other than those of the Bell system are referred to as independent companies, including all parties hereto. Toll calls between independents where only the local exchange and General's facilities are used are referred to as Independent-Independent (I-I) calls. Toll calls utilizing, in addition, any facilities of the Bell System are referred to as Bell-Independent (B-I) calls. The originating exchange collects the toll charges on both I-I and B-I calls (as computed by its toll center) and remits the whole amount to General. On B-I calls General, in turn, accounts to Illinois Bell for all intrastate and interstate toll revenues collected by both plaintiffs and General. The joint revenues are then divided among the several companies participating in the handling of each call. The dispute here is the division of joint revenues between plaintiffs and General.

Tariff charges (rates) are prepared by AT&T and filed with the Illinois Commerce Commission for intrastate traffic and with the Federal Communications Commission for interstate traffic. It is conceded by plaintiffs that because of the nature of the toll business, rates must be uniform.

Illinois utilities (including co-operatives) do not file their own toll rates, but concur in and use the effective rates of Bell through toll settlement agreements. The tariffs so voluntarily accepted by the independents are then approved by the Commission.

The division of joint revenues (toll settlements) produced under the tariffs are negotiated with the Bell System by the United States Independent Telephone Association (USITA), an organization of independent companies. USITA from time to time negotiates, on the basis of nation-wide averages, toll settlements with the Bell System for both intrastate and interstate combined B-I calls, and then recommends execution of traffic agreements to its members in accordance with the proposed schedules. Standard traffic agreements are then offered by Illinois Bell to its direct interconnected companies (such as General). After petitioning and receiving authority to do so, these companies usually offer similar traffic agreements to their direct inter-connected companies (such as plaintiffs) for I-I tolls even though the settlements were designed for application to B-I calls only.

The traffic agreements between plaintiffs and General with respect to tolls originating with plaintiffs in effect just prior to the institution of these proceedings were based on a formula devolved in 1961 by the Bell System and USITA. All revenues derived from both I-I and B-I tolls, intrastate and interstate alike, were divided by the parties hereto on the B-I formula, even though the schedules contained no division for I-I calls. In the fall of 1963, General notified its connecting independents that it proposed to offer the new proposed 1962 USITA-AT&T schedule as a basis of settlement for both intrastate and interstate B-I business originated by the independents. It refused, however, to apply the B-I rates to I-I intrastate tolls (there is some dispute as to whether General had earlier stated it would do so) but proposed use of a schedule known as the 1953

TCC1-A schedule (developed by USITA) for all I-I calls originated by the connecting independents. We note parenthetically that USITA last recommended a settlement plan for I-I toll traffic in 1953, and that its Settlements and New Services Committee, including General's member of that committee, was of the opinion that all toll business, both B-I and I-I, should be included in settlement arrangements with the Bell System, but that Bell's representatives are not willing to accept settlement responsibility for traffic in which Bell does not participate. Plaintiffs and other independents refused to accept the new traffic agreements proposed by General, and plaintiffs filed their complaint with the Illinois Commerce Commission. General terminated the then existing traffic agreements as of June 1, 1964, and none have been in effect since that date.

I-I calls are short haul, usually between adjoining exchanges involving 15 to 20 cent toll charges, and the cost of furnishing the service often exceeds the revenue derived under the rates charged. In contrast B-I tolls are based on a sliding scale and obviously increase with the distance to the place of termination of a call. B-I interstate calls are usually long haul, as are B-I intrastate calls to a lesser degree, and are sufficiently compensatory to more than average out the loss on short-haul calls.

A pilot study was made by plaintiffs through a time study of the actual use of equipment of the Cooksville exchange of plaintiff Inland Telephone Company to determine the relative rate of return on the total toll business of Cooksville, I-I and B-I, intrastate and interstate, based on use of the several schedules. It is conceded by the parties that the results of the Cooksville study were reasonably typical of the rate return of the other exchanges. The study disclosed that if the 1962 USITA-AT&T and TCC1-A combination of schedules proposed by General be applied, the toll business of plaintiffs would result in a minus 2.3% return, that application of 1961 USITA-AT&T B-I schedule would pro-

duce a plus return of .98% and if the 1962 USITA-AT&T B-I schedule were applied to I-I tolls a plus return of 4.62% would be produced. While there was some variance General's witness Eaker conceded that plaintiffs' figures reasonably represented plaintiffs' cost of providing all intrastate and interstate toll services at Cooksville.

General presented a study of results of its toll calls to and from Cooksville for six of its exchanges which represented more than three-fourths of General's toll calls with Cooksville. It showed a minus 3.1%, a minus 8.5% and a minus 11.8% rate of return, respectively, under the foregoing schedules for which percentages were computed under plaintiffs' study. General cites Champaign County Telephone Company's Cooksville exchange I-I intrastate calls as an example of the effect if plaintiffs' demands are met. The average toll for such calls is 21.1 cents and the amount plaintiffs would be entitled to under the 1962 USITA-AT&T schedule amounts to 27.4 cents per message so that plaintiffs would receive all of the I-I toll revenues plus an additional 6.3 cents per message which General would have to contribute from other earnings.

In one of the late hearings before the Commission General presented evidence that USITA's committee had designed a new traffic schedule for I-I traffic (1965 USITA) and had recommended it to its members. It was designated Letter No. 953, signed by its Director of Settlements, and had attached a resolution by the USITA Board of Directors in which the board directed the committee to recommend to independents a settlement of I-I toll traffic. (Division of revenues under this schedule would produce about the same amount to plaintiffs as the TCC1-A schedule offered.) General then stipulated that it would offer plaintiffs their choice of the 1953 TCC1-A or 1965 USITA schedule for settlement of I-I traffic.

Plaintiffs' complaint to the Commission originally asked for a division of joint revenue from all tolls which would

have included interstate as well as intrastate messages, but following a motion to dismiss or amend, they amended their complaint and prayer to limit their request to joint revenues from intrastate tolls originating or terminating in one of their exchanges.

The Commission found that the burden of proof was upon plaintiffs and that they did not sustain the burden of demonstrating their costs of participating in the I-I intrastate toll traffic sufficiently to establish a basis for the commission to make a division of the I-I toll messages, that the only funds available for settlements between General and plaintiffs for the interchange of I-I intrastate tolls must be derived exclusively from the application of joint intrastate toll rates to the messages, that a fair and equitable division must be predicated upon the relative contributions by the participating parties of investment expense and functions, and that both the settlement and alternative settlement stipulated by General fairly represents the relative contributions of facilities and service of the parties. The commission then ordered settlement for all tolls from June 1, 1964, to the date of its order on the 1961 USITA-AT&T traffic schedules, and that General prepare and plaintiffs accept monthly toll settlements for all B-I messages under the terms of the 1962 USITA-AT&T traffic schedules, and all I-I messages under the terms of either the USITA-1953 TCC1-A schedule or the proposed 1965 USITA schedule from the date of the order until further order of the Commission. The Commission specifically recognized that it had no authority to enter the order with respect to B-I interstate calls although the order does not distinguish between B-I intrastate and B-I interstate tolls.

Plaintiffs' theory on rehearing and on this appeal is that the order compelling them to operate the toll department of their business at a loss or negative rate-of-return is confiscatory and violative of their right of due process

under the Illinois constitution and the fourteenth amendment to the constitution of the United States.

General argues that, in addition to performing the function common to it and plaintiffs of originating and terminating toll calls, it alone performs the second function of timing and ticketing of toll calls so that a proper charge may be made to the toll customers and, in addition, furnishes a substantial portion of the toll lines connecting the originating and terminating exchanges. Yet, it asserts plaintiffs seek a disproportionate share of I-I toll revenues and asks that General be forced to absorb the bulk of the losses on this traffic.

At the outset it must be recognized that the Illinois Commerce Commission has not been asked to establish new joint intrastate toll rates. In fact, the joint rates now in force in Illinois have not only been authorized by the Commission as uniform intrastate toll rates, but have been accepted and concurred in by both General and plaintiffs. The complaint did not attack the reasonableness of the intrastate toll rates nor was the Commission asked to make any change in them. Rather, the relief sought by plaintiffs is a larger share of the revenues produced by the agreed rates.

Under section 42 of the Public Utilities Act, (Ill. Rev. Stat. 1965, chap. 111⅔, par. 42,) the jurisdiction of the commission is two-fold. First, it is empowered to fix reasonable and sufficient joint rates and, second, it may establish a division of joint rates if the utilities involved do not agree. The relief sought is restricted to the second function and plaintiffs attack is directed solely to the fairness of the division.

It is apparent from the record that under existing approved tariffs I-I toll calls, facilities for which are jointly provided by General and plaintiffs, are not particularly lucrative to either of the parties and in some instances are

made at a loss. While plaintiffs recognize this to be the case, they argue that since they are compelled by section 44 of the Public Utilities Act (Ill. Rev. Stat. 1965, chap. 111⅔, par. 44,) to receive and transmit messages of every other company with which a joint rate has been established or with whose line they have a physical connection, they are entitled to a fair rate of return. In support of this position they cite a number of rate cases which, of course, hold that a public utility cannot be compelled to serve the public without reasonable compensation and if the power is so exercised as to force a public utility to devote its property to the public use without reasonable compensation it has been deprived of equal protection of the law and is a violation of due process. See, *e.g., City of Edwardsville* v. *Illinois Bell Telephone Co.,* 310 Ill. 618; *Illinois Central Railroad Co.* v. *Illinois Commerce Com.,* 387 Ill. 256; *Fleming* v. *Illinois Commerce Com.,* 388 Ill. 136.

Plaintiffs recognize that most of the cases analyzed by them are rate cases but they assert that a division of joint rates must be tested by the same standards. While there is a similarity in the two situations they are not identical, the division of revenues produced by predetermined agreed rates being in issue, not the rates which produce the revenue. There could be unconstitutional deprivation. For example, if, in the division the order of the Commission gave a wholly and manifestly disproportionate share of the tolls to General so that plaintiffs were left without reasonable compensation, undoubtedly they would be entitled to relief. But, this cuts both ways. If the order gave plaintiffs the manifest advantage, General would have a justifiable complaint.

Section 68 of the Public Utilities Act (Ill. Rev. Stat. 1965, chap. 111⅔, par. 72,) provides that the findings of fact by the Commission are *prima facie* true and its decision cannot be set aside unless it clearly appears that its findings are against the manifest weight of the evidence. As we have said: "* * * our investigation is limited to the questions

whether the Commission acted within the scope of its authority, whether its findings have substantial foundation in the evidence, and whether a constitutional right has been infringed." *Galt* v. *Illinois Commerce Com.,* 28 Ill.2d 501, 505; *Forest Preserve District* v. *Illinois Commerce Com.,* 12 Ill.2d 319; *Chicago, Burlington & Quincy Railroad Co.* v. *Illinois Commerce Com.,* 33 Ill.2d 274.

Plaintiffs charge that the Commission's finding of failure on their part to demonstrate revenues available for division of intrastate I-I tolls was improper, because they did not ask the Commission to divide I-I intrastate tolls but requested it to divide all intrastate tolls. Their proof was largely devoted to their rate of return for all toll service, I-I and B-I, both intrastate and interstate. James C. Barnard, a consulting engineer in this field testified in behalf of plaintiffs that a separation study exhibit was for both interstate and intrastate tolls, but that from the information available to him he could have determined the rate of return on intrastate business only. However, he was instructed not to do so and was told to treat B-I and I-I as total toll. Plaintiffs do not complain of the B-I division and, in fact, seek application of the same division for their I-I business. Since the Commission has jurisdiction only of intrastate business with the power to establish or approve rates, it must be furnished with proof of the cost (investment and overhead) of I-I operations in order to ascertain rates for those calls which will produce a fair return. It has long been held that the burden of proof in rate cases is upon the complainant to show unreasonableness or discrimination, (*State Public Utilities Com. ex rel. Farmers' Illinois Grain Dealers Ass'n* v. *Atchison, Topeka and Santa Fe Railway Co.,* 278 Ill. 58; *Antioch Milling Co.* v. *Public Service Co.,* 4 Ill.2d 200,) and the same rule should apply with equal force where complaint is made as to the division of joint revenues. Plaintiffs concede that their proof included both intrastate and interstate traffic but argue that the inclusion of interstate tolls had the

effect of improving their rate of return. Such generalized proof, while tending to show their costs, does not demonstrate with sufficient certainty their cost of participating in I-I intrastate traffic to provide a basis for division by the Commission of the joint revenues. We are of the opinion that the Commission's finding of failure of proof was justified.

We pass to the question of whether the Commission's order for division of joint revenues was justified. It may seem inconsistent to say that plaintiffs did not sustain the burden of proof as to cost of their I-I service and for the Commission, nevertheless, to proceed to enter an order approving a division of I-I rates. The dilemma of the Commission was that while they had no satisfactory evidence with respect to plaintiffs' I-I calls, the record conclusively showed that if the 1962 USITA-AT&T schedule for B-I calls be applied to I-I calls, General would suffer a severe loss in that department of its business. Those calls (I-I) are a separate and distinct class or department, and application of B-I settlements to them is not justified. There was positive evidence in the record that I-I settlements have never been included in USITA-AT&T schedules and that the only two USITA recommended settlements for them were the 1953 TCC1-A and the proposal contained in USITA Letter No. 953. The Commission's only recourse was to order use of either of the schedules and to give plaintiffs the right of choice between them.

It is argued that General has executed a new traffic agreement with Bell based on the new 1962 USITA-AT&T schedule, which the evidence shows will substantially increase General's total toll revenues. The inference sought to be drawn from that evidence seems to be that because General will make more money in other departments it can afford to use some of the revenues to help bolster plaintiffs' I-I revenues. In a leading case, (*Illinois Central Railroad Co.* v. *Illinois Commerce Com.* 387 Ill. 256,) it was held

that even though combined revenues from an entire system produced a reasonable return, a public utility is entitled to a fair return from each of its departments, such as suburban service. (See also *Fleming* v. *Illinois Commerce Com.,* 388 Ill. 138; *Mt. Carmel Public Utulity and Service Co.* v. *Public Utilities Com.,* 297 Ill. 303.) The fact that General's operation of its B-I interstate and intrastate will result in a substantial profit would not justify the Commission in forcing it to use those returns to bolster the I-I returns of the independents.

There seems to be a feeling on the part of plaintiffs that since General has heretofore made toll revenue settlements from time to time on the basis of B-I interstate calls that there is some obligation to continue to do so. Whether this was done for convenience, in the absence of a rate for I-I calls, or for other reasons is not proof that they left a fair return under previous schedules, or would leave a fair return under the new schedule.

These cases pose complex problems because so many factors are involved, not the least of which is the practical necessity for uniformity. The dual jurisdiction of Federal and State regulatory bodies, the number of companies involved, and the magnitude of the mechanics in securing a satisfactory division of rates in every jurisdiction makes the task a formidable one. The order fixing the alternate division of joint revenues had a substantial foundation in the evidence and is not contrary to the manifest weight of the evidence.

The judgment of the circuit court of Hardin County confirming the order of the Illinois Commerce Commission is affirmed.

*Judgment affirmed.*